535 S.E.2d 431

**The STATE, Respondent,**

v.

**Raymond DAY, Appellant.**

No. 25167.

Supreme Court of South Carolina.

Heard May 10, 2000.
Decided July 6, 2000.

Assistant Appellate Defender Robert M. Dudek, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General William Edgar Salter, III, all of Columbia; Solicitor Barbara R. Morgan, of Aiken, all for respondent.

TOAL, Chief Justice:

Raymond Day ("Day") appeals his convictions for murder and possession of a firearm during the commission of a violent crime. We reverse and remand.

## FACTS/PROCEDURAL BACKGROUND

This case involves a complicated love triangle, a murder conspiracy, and a stolen trailer. In March of 1996, Wayne Renew ("Renew") hired Day to kill his ex-girlfriend, Debra Bouchillon (Bouchillon), because she turned him into the police for giving her a stolen trailer in satisfaction of a debt. Renew planned to give Day two hundred dollars and a red truck in exchange for killing Bouchillon. However, the events did not occur as Renew intended.

Renew and Day were good friends and roommates who enjoyed partying and abusing crack cocaine. Both men had been romantically involved with Bouchillon prior to the shooting. Renew was angry at Bouchillon for turning him into the police so he decided to hire Day to murder her. On several occasions, Renew discussed various ways that Day could kill Bouchillon. According to Day, these included, "sneaking in the back door and slicing her throat. Another way he showed me three tubes of explosives, told me to mix the explosives up, cut a hole in the top of the explosives big enough for two wires to fit in and run it to the car to the core." Renew suggested that Day either shoot, stab, or blow up Bouchillon. Day claimed he only agreed to kill Bouchillon because "if I didn't agree he would have got somebody else to do it."

Day's plan was to go to Bouchillon's house, tell her to call the police, and have Renew detained until he could make further statements to the sheriff's department. Day testified that once he arrived at Bouchillon's house he "told her that Wayne wanted her dead and that he had hired me to kill her and that I could not kill her . . . I told her I loved her and she hugged my neck." He then made an anonymous phone call to the police informing them that Bouchillon was going to be harmed that night because he did not "want to be tied up in a conspiracy for murder." Bouchillon believed Day's story because earlier that evening she received an anonymous phone call informing her that Renew planned to kill her.

According to Renew's plan, Day was supposed to meet him on a dirt road after killing Bouchillon. Day told Bouchillon that he had to meet Renew or he would find out that he had not killed her. At 2:30 a.m., Day and Bouchillon decided to meet Renew. Bouchillon hid in the back seat of the car under

some blankets as Day drove. They brought along Bouchillon's pistol and a pillowcase filled with valuables so that Renew would think Day robbed Bouchillon after killing her.

While Bouchillon stayed hidden in the car, Day met Renew and told him that he murdered Bouchillon. They returned to their cars and Day and Bouchillon followed Renew to Muddy Branch Road, a desolate dirt road. Renew stopped his car and motioned to Day that he wanted to speak to him. Day became frightened because he thought Renew had figured out he had been duped. According to Day,

> I was talking to Wayne listening to what he said and looking, and then I just caught it out of the corner of my eye, the blankets coming up and came up and went down real quick and I saw Mr. Renew reach for a gun ... and I saw Mr. Renew go like this (indicating). And by the time he had come up, I had shot him. I really thought he had a gun. I re-live that moment every day.

Day claims he was terrified and just kept shooting. Day and Bouchillon returned to her home after the shooting. Day admits to dropping several items, including a crack pipe and extra bullets, into a vent in Bouchillon's trailer to conceal them from the police. Day contends that he did not initially tell the police what happened because he was afraid his story was unbelievable.

In July 1996, Day was indicted for murder and possession of a firearm during the commission of or attempt to commit a violent crime. Although the trial judge indicated he would not charge the jury on self-defense, he gave a self-defense instruction based upon a question from the jury inquiring about the South Carolina law of self-defense. The jury found Day guilty and the trial judge sentenced him to life imprisonment for murder and to a concurrent sentence of five years imprisonment for the possession of a firearm during the commission of a violent crime. Day appeals his convictions on the following issues:

1. Whether the trial judge erred by refusing to charge self-defense in his initial jury charge?

2. Once the jury requested an instruction on self-defense, did the trial judge err by refusing to instruct the jury that Day did not have the burden of proving self-

defense, that the state had to disprove self-defense, and that the jury could consider past difficulties between the parties?

3. Did the trial judge err by refusing to allow Marva Szumowicz to testify that Renew held a double-barrel shotgun to her head for eighteen hours because he was suspicious of her?

4. Whether the trial judge erred by allowing the state to cross examine a defense witness about Day's tattoo, which read "Outlaw", because it may have constituted an impermissible attack on Day's character?

## LAW/ANALYSIS

### I. Trial Judge's Refusal to Charge Self–Defense

Day argues the trial judge erred by refusing to give a self-defense charge because there was sufficient evidence presented at trial entitling him to this instruction. We agree.

A self-defense charge is not required unless the evidence supports it. *State v. Goodson*, 312 S.C. 278, 440 S.E.2d 370 (1994). To establish self defense in South Carolina, four elements must be present: (1) the defendant must be without fault in bringing on the difficulty; (2) the defendant must have been in actual imminent danger of losing his life or sustaining serious bodily injury, or he must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) if his defense is based upon his belief of imminent danger, defendant must show that a reasonably prudent person of ordinary firmness and courage would have entertained the belief that he was actually in imminent danger and that the circumstances were such as would warrant a person of ordinary prudence, firmness, and courage to strike the fatal blow in order to save himself from serious bodily harm or the loss of his life; and (4) the defendant had no other probable means of avoiding the danger. *State v. Bryant*, 336 S.C. 340, 520 S.E.2d 319 (1999).

"If there is any evidence in the record from which it could reasonably be inferred that the defendant acted in self-defense, the defendant is entitled to instructions on the defense, and the trial judge's refusal to do so is reversible

error." *State v. Muller,* 282 S.C. 10, 316 S.E.2d 409 (1984). There is sufficient evidence in the instant case to support a charge on self-defense. Day testified he believed he was in imminent danger because he thought Renew was going to pull a gun on him. Day gave the following testimony about the fatal incident:

> I pulled in and turned around and pulled in front of him [Renew] and I walked to the truck and he said something and I said something and he pulled a gun on me. I pulled Debbie's gun out and shot him in the head the first shot and I don't know where the last stuff, the first shot went.

According to Day's theory, Renew was a violent drug abuser who had a history of violence against him and others.[1] Day knew that Renew had a tendency to violently overreact, and when he thought Renew saw Bouchillon move under the blankets, he believed he was in imminent danger and shot Renew to defend himself.

Day presented an evidence based theory as to what occurred that evening. Although some of the evidence was disputed, there was certainly enough evidence in this case to make self-defense a jury question. Defense counsel felt so strongly about the trial judge's refusal to give a self-defense instruction that she moved for a mistrial. She convincingly argued that the trial judge cast aside Day's entire defense and removed it from the jury's consideration.

## II. Self–Defense Charge

Day argues the trial judge erred by refusing to instruct the jury that Day did not have the burden of proving self-defense, and that the jury could consider past difficulties between the parties in weighing self-defense. We agree.

The trial judge initially refused to charge the jury on self-defense. However, the jury inquired about the South Carolina law on self defense. The jury wrote: "What does the

---

1. Day claims that Renew previously pulled a gun on him. Day testified: "I was at his house one night which I had a key to. Mr. Renew was drinking at the time. He said I was making too much noise when I come into the house. He pulled the gun on me at which I [sic] proceeded to leave ... Mr. Renew has always toted a gun as long as I've known him."

State of South Carolina have to say when a person can defend themself [sic] with the use of deadly force. May we see a copy of the law concerning this?" In response, the trial judge charged the jury a standard self-defense instruction as outlined by this Court in *State v. Davis*, 282 S.C. 45, 317 S.E.2d 452 (1984) along with a specific charge on the right to act on appearances and the duty to retreat. The trial judge did not include in his instruction Day's Request to Charge Number One (factors that would give Day the right to judge Renew's conduct more harshly, including age difference, substance abuse, "bad blood", prior threats, and reputation for violence); Number Two (prior acts of violence and prior difficulties between Day and Renew); and Number Eight (the State's burden of proof when a defendant asserts self-defense).

The trial judge's failure to charge on the specific elements of self-defense that were applicable to Day's theory constitutes reversible error. As we held in *Fuller*, a trial judge should specifically tailor the self-defense instruction to adequately reflect the facts and theories presented by the defendant. *State v. Fuller*, 297 S.C. 440, 377 S.E.2d 328 (1989). A self-defense charge is erroneous where the trial court fails to charge on elements of the defense which were applicable to the issues raised by the defendant. *Id.* The trial judge's instruction in this case was incomplete. It should have included a charge indicating: (1) Day had a right to judge the conduct of Renew more harshly than otherwise because of Renew's drug consumption (Defendant's Request to Charge Number 1); and (2) the jury could consider prior instances of violence or unprovoked aggression by Renew in determining whether Day had a reasonable belief of imminent danger (Defendant's Request to Charge Number 2). Central to Day's defense was his argument that Renew had previously pulled a gun on him and that Renew was in a drug-induced paranoia the day of the incident. The jury charge was, therefore, incomplete because the trial judge failed to charge on Renew's substance abuse or his prior acts of violence.

The trial judge's "after-the-fact" self-defense instruction was inadequate because defense counsel was unable to present a complete defense during her summation. In her closing argument, defense counsel could not assert self-defense, even though that was Day's theory, because she knew the trial

judge was not going to adequately charge the jury. Instead, she was forced to present the facts so they implied self-defense, without actually saying the word. For example, in her closing defense counsel states:

> [Day] knew Wayne to be a violent person who would immediately take action against someone who had double-crossed him.... [H]e told you he saw Wayne's hands come down and he shot him.... Raymond Day honestly believed that he was reaching for a gun. Raymond knew that Wayne carried a gun. He knew Wayne carried the gun stuck in the waistband of his pants or under the seat and he just seen Debbie's head pop up, he knew he had double-crossed Wayne Renew and he did what he had to do. He honestly believed that was the only course of action he could take and he pulled the gun out from his waistband where he held it and he had to shoot Wayne Renew.

Defense counsel attempted to make a case for self-defense but was restricted because she knew the jury was not going to be so charged. The trial judge belatedly recognized that a self-defense charge was necessary. Providing an "after-the-fact" instruction was inadequate because the prejudice to Day was incurable. Day was unable to adequately assert a complete defense during the trial, and the jury was left with the impression that the trial judge did not think the law of self-defense was applicable to the case.

### III. Testimony Concerning Other Specific Instances of Violence

Day argues the trial judge erred by excluding testimony of Marva Szumowicz ("Szumowicz") concerning a past act of violence that was closely related in time and occasion to the homicide and served as strong corroborating evidence that Renew was a vengeful person. We agree.

In the murder prosecution of one pleading self-defense against an attack by the deceased, evidence of other specific instances of violence on the part of the deceased are not admissible unless they were directed against the defendant or, if directed against others, were so closely connected at point of time or occasion with the homicide as reasonably to indicate the state of mind of the deceased at the time of the

homicide, or to produce reasonable apprehension of great bodily harm. *State v. Brown,* 321 S.C. 184, 467 S.E.2d 922 (1996); *State v. Amburgey,* 206 S.C. 426, 34 S.E.2d 779 (1945). Whether a specific instance of conduct by the deceased is closely connected in point of time or occasion to the homicide so as to be admissible is in the trial judge's discretion and will not be disturbed on appeal absent an abuse of discretion resulting in prejudice to the accused. *Id.* (citing *State v. Peak,* 134 S.C. 329, 133 S.E. 31 (1926)).

To support his theory of self-defense, Day wanted to cross-examine Szumowicz concerning a past act of violence by Renew. At an *in camera* hearing prior to trial, Day argued he should be allowed to present testimony from Szumowicz concerning a November 30, 1995 incident where Renew held a double-barreled shotgun to her head for eighteen hours as he drove around Aiken County and accused her of being involved with others in a drug trafficking scheme in his residence. According to Szumowicz, "He thought that there was drug trafficking going on in his ... yard or his premises there and that he was not getting any benefit from what was going on and that I was to produce at least a thousand dollars on his table by that night which he then continued until twelve o'clock ... the next day."

The trial judge ruled that specific instances of Renew's conduct was inadmissible under Rule 405, SCRE [2] and *State v. Brown, supra,* but allowed Day to present Szumowicz's opinion as to whether Renew was a violent person. In *Brown,* this Court found that the trial judge did not abuse his discretion in refusing to admit a prior act of violence by the deceased in support of a self-defense charge because of the remoteness of the specific act of violence, which occurred twenty-three years prior to the incident in question. *Brown,* 321 S.C. at 187, 467

---

**2.** Rule 405, SCRE states:

(a) **Reputation or Opinion.** In all cases in which evidence of character or a trait of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) **Specific Instances of Conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

S.E.2d at 924; *see also State v. Evans,* 112 S.C. 43, 99 S.E. 751 (1919) (holding trial judge in a manslaughter trial did not abuse discretion in excluding record of indictment of deceased for burglary where burglary charge was not sufficiently connected in time and circumstances to be submitted as evidence affecting self-defense).

 In this case, the prior act of violence against Szumowicz occurred only four months prior to Renew's death and was admissible to prove Day had a reasonable apprehension of violence from Renew, an essential element of his self-defense claim. Szumowicz's testimony demonstrates that Renew acted very violently when he felt he had been deceived or double-crossed by a confidant. This evidence is relevant to Day's theory of self-defense because he claimed he thought Renew may pull a gun on him if he thought Day had deceived him by allowing Bouchillon to hide in the back seat of the car. Renew's conduct in holding a gun to Szumowicz's head because he was suspicious of her is also further evidence of the continuous and consistent pattern of Renew's drug-induced, violent paranoia, which the defense attempted to establish during trial.

## IV. Day's "Outlaw" Tattoo

Day argues the trial judge erred by allowing the state to cross-examine Thomas Cuppernell ("Cuppernell") about Day's "Outlaw" tattoo and nickname because this testimony was used to impugn Day's character. We agree.

 The State submits Day's argument concerning his tattoo and nickname is not properly before this Court because the argument advanced on appeal was not presented in the lower court. During the cross-examination, defense counsel objected to any categorization of the word "outlaw" and to any explanation of the term's meaning by the witness. On the State's cross-examination of defense witness Cuppernell, the following exchange occurred concerning Day's tattoo and nickname:

> **Question:** And do you know if Mr., if the Defendant had a nickname?
>
> **Answer:** Yes, ma'am.

**Question:** What was his nickname, Mr. Cuppernell?

**Answer:** Outlaw.

**Question:** In fact, they called him outlaw; didn't they?

**Answer:** Some did.

**Question:** Some did. In fact, he, the Defendant, has outlaw tattooed on him, doesn't he?

**Answer:** Yes ma'am.

**Defense Counsel:** Objection, Your Honor. I'm going to object to any categorization of the word outlaw and any explanation of whether the witness understands what that phrase might have him meant [sic].

**The Court:** Overruled. You can answer the question.

**Question:** Raymond Day had a nickname. What was it, Mr. Cuppernell?

**Answer:** Outlaw.

**Question:** Excuse me?

**Answer:** Outlaw.

**Question:** And he not only went by that nickname, he had it on his body; am I correct?

**Answer:** Yes, ma'am.

**Question:** And where was the word, is the word outlaw on the Defendant, Raymond Day? Where is it tattooed on him?

**Answer:** I don't remember but I remember seeing it on his body. He's got it tattooed on him but I can't remember exactly where.

Defense counsel's objection to any "categorization" of the term outlaw adequately preserves the defense's argument that Day's tattoo and nickname were used to impugn his character.

 Evidence concerning a defendant's tattoo or nickname is not prejudicial when used to prove something at issue in a trial, such as the identification of the defendant. *See generally Stevenson v. Texas*, 963 S.W.2d 801 (Tex.App.1998) (holding defendant's "bitch killa" tattoo was admissible evidence of gang membership). In the instant case, the State did not use Day's tattoo or nickname for any purpose other than to attack his character. The solicitor repeatedly referred to Day as an outlaw in her closing argument in order to paint a

picture of Day as someone who was proud of his status as an outlaw, who felt he was above the law, and who was able to deceive law enforcement by hiding evidence and concocting a story about self-defense.

A prosecutor's comments deprive the accused of due process of law where the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Tubbs,* 333 S.C. 316, 509 S.E.2d 815 (1999) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431, 437 (1974)). This Court held in *State v. Tubbs, supra,* that a prosecutor's use of a nickname can deprive the defendant of due process if the use of the nickname is so excessive and repetitious as to infect the entire trial with unfairness. In *Tubbs,* the solicitor's reference to defendant's nickname, "Cobra", during summation did not infect the entire trial with unfairness because it was only used seven times, and one of those times was used to establish identity. *Id.* at 316, 509 S.E.2d at 818. However, in *State v. Hawkins,* 292 S.C. 418, 357 S.E.2d 10 (1987) *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991), this Court held that the solicitor's reference to defendant's nickname, "Mad Dog", over forty times during the guilt and sentencing phase was excessive and repetitious and denied the defendant due process.

The solicitor referred to Day as an outlaw or to the word "outlaw" twenty three times during her summation. The solicitor's reference to the nickname was excessive and repetitious, and was not used to prove any matter in controversy. The solicitor's continuous use of the nickname was extremely prejudicial because it was used to portray Day as a "planner", someone who was accustomed to deluding law enforcement, and someone who was proud of his notoriety as an outlaw. The following examples from the solicitor's summation illustrate how she utilized the term "outlaw" to impugn Day's character:

"I'm going to be the outlaw. I'm going to be the famous man. I'm going to make history in Aiken County."

"I get my gun and do I just take just enough to put the five shots, huh-uh. I'm a planner. I'm an outlaw."

"I can be the outlaw because I have decided I'm the outlaw and I'm going to do what it takes now."

"I know I planned it. I made the decision of what I was going to do. I am an outlaw, hit man and I get to do whatever I please."

The solicitor closed her summation with the following:

"And, ladies and gentlemen, the law of this county, the law of this state, the law in this country is that that is murder and the only, only verdict that is appropriate on both counts for the murder and then the use of that pistol in commission of that murder is guilty for this man, the outlaw, Raymond Day."

Overall, the use of the term "outlaw" permeates the solicitor's closing argument, infects the trial with unfairness, and deprives Day of due process of law.

## CONCLUSION

Based on the foregoing, we **REVERSE** Day's convictions for murder and possession of a firearm or knife during the commission of or attempt to commit a violent crime and **REMAND** for a new trial.

WALLER, BURNETT, PLEICONES, JJ., and Acting Justice J. ERNEST KINARD, Jr., concur.