626 S.E.2d 890

**The STATE, Respondent,**

v.

**Jacqueline MEKLER, Appellant.**

No. 4035.

Court of Appeals of South Carolina.

Heard Sept. 14, 2005.

Decided Oct. 31, 2005.

Withdrawn, Substituted, and Refiled Dec. 15, 2005.

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Melody J. Brown, all of Columbia; and Solicitor David Michael Pascoe, Jr., of St. Matthews, for Respondent.

HUFF, J.:

In this criminal case, Jacqueline Mekler appeals following her conviction for murder. Mekler asserts the trial judge erred in (1) refusing to allow her to impeach one of the State's witnesses, the deceased's wife, with evidence that the witness expressed fear of the deceased after a domestic dispute when the witness denied she was ever afraid of the victim; (2) refusing to allow evidence appellant was aware of the deceased's prior act of violence against the wife and the wife's property, as this was relevant to appellant's claim of self-defense; and (3) refusing to instruct the jury on the law of involuntary manslaughter because appellant asserted a self-defense theory, where there was evidence appellant armed herself in self-defense but discharged the gun due to her reckless handling of the weapon. We reverse and remand for a new trial.

## FACTUAL/PROCEDURAL BACKGROUND

On the night of March 8, 2002, officers responded to a call at the home of Mekler after receiving a report that a man had been shot. When the first officer arrived, he found a man lying face down on the ground and observed two women standing

4

near the porch of the home. The women approached him and one of them, Mekler, told the officer she "just shot the person who was lying on the ground." The victim, Phillip Bubba Spires (hereinafter Bubba), was transported to the hospital with gun shot wounds to the chest. The medical personnel lost Bubba's pulse on the way to the hospital and Bubba was later pronounced dead at the hospital. An autopsy revealed Bubba died from a single gunshot that caused numerous pellets to hit and enter his body, resulting in damage to vital organs. Deputy Richard Combs arrived on the scene and took a statement from Mekler.[1] Mekler told Deputy Combs that she had been sitting on her porch with Bubba's wife, Robette Spires, talking and drinking when Bubba pulled up in her yard in his truck. Bubba began screaming and yelling at Robette, asking why she was not at home and stating that she should have called him. Mekler told Bubba to leave several times. After a few minutes of "yelling back and forth," Bubba left in his truck. A few minutes later, Bubba returned on foot. This time, Bubba had a knife in his hand. Bubba came onto the porch and the screaming and yelling started again. Mekler went into her house and retrieved a sixteen-gauge shotgun. When she returned to the porch, Bubba still had a knife in his hand. Bubba continuously tried to get Robette to leave with him. Mekler told Bubba several times to leave or she would shoot him. Mekler was afraid Bubba was going to hurt Robette if Robette left with him. Mekler stated she did not remember pulling the trigger, nor the shotgun going off, and the next thing she knew, Bubba grabbed his chest and Robette said, "You shot him."

Deputy Combs also took a statement from Robette that night. Robette told him that she and Mekler had been talking and drinking on the front porch when Bubba pulled up in the yard in his truck. Bubba started yelling and screaming at her, "Why aren't you home? You should have called and told me where you were." Mekler told Bubba several times to leave. Bubba left a few minutes later and, a few minutes after that, returned on foot. When Bubba came back, he had a knife in his hand. Mekler, at that time, went into the house

---

1. After the initial statement to the first officer on the scene, Mekler was advised of her rights before any further statements were given by her, and there is no issue as to the voluntariness of any of her statements.

and retrieved a sixteen-gauge shotgun. Mekler told Bubba several times to leave or she would shoot him. Robette asked Bubba why he had the knife, and he stated "it's not for you, it's for the dog in case it tries to attack me." Robette did not think Mekler heard Bubba say that. Robette stated she believed that Mekler believed she was protecting Robette.

Detective Rhonda Bamberg testified that as she transported Mekler to the Orangeburg County Sheriff's Office, Mekler began to tell her about the incident. Mekler told the detective that she and Robette were drinking and talking when Bubba came up in his truck. Bubba "got out and began to carry on about why Robette was not home and why she didn't call." Mekler told Bubba he needed to calm down or leave. Bubba got in his truck and left. A little while later, Bubba returned, brandishing a knife. Mekler told Bubba he did not need a knife. Mekler grabbed her dog that was chained to the front porch. Bubba said the knife was for the dog. Mekler told Bubba that if he were to quiet down, the dog would stop. Mekler told Bubba to leave or she would shoot him. Mekler stated Bubba was a big man and she was afraid of him. Bubba would not leave. Mekler went into the house and came out again. "She brought the gun down and don't (sic) remember the shot, but Robette said, Jackie, you've shot him." Mekler said, "No, I didn't." Robette said, "Yes, you did." Mekler told Robette to go call 9-1-1. Mekler again stated that she was afraid of Bubba and that he would not leave.

Once at the Sheriff's Office, Mekler gave another statement, this time to Detective Rush. Mekler told the detective that she and Robette were sitting on her porch drinking and talking. One of Robette's daughters pulled into the yard and told Robette that Bubba had called and wanted Robette to call him when she got home. Thereafter, Bubba pulled up in his truck, got out and then began "screaming and crying at Robette." Bubba said, "Why are you doing this to me? Didn't they tell you to call me?" Robette said, "Yes," and began walking toward Bubba. Then Bubba started yelling at Robette saying "Why are you here? Why haven't you called me?" Mekler described Bubba as "loud and showing himself." Mekler stated she was afraid Bubba was going to hit Robette, and stated Bubba was "flailing around" and possibly hit his truck. Mekler walked down to Bubba and asked him to come sit with

them and talk. Bubba kept yelling at Robette, and the two women tried to calm him. Bubba kept yelling and Mekler told him that if he did not calm down, he would have to leave because he could not act that way in her yard. Bubba replied, "this is my wife and I'll act any way I want." Robette told Bubba he could not "show out like that" in Mekler's yard. Bubba ran into the street and yelled that he was not in the yard and asked what Mekler was "going to do now." Mekler told him she would call the police. Bubba continued to yell at them. Mekler told him she kept a gun and Bubba replied, "Bring it on." Bubba then got in his truck and left. Robette, who had gone back to the porch and sat down, stated that Bubba was expecting her to "go up there." Mekler advised Robette she should not go, but should give Bubba time to cool down. About five minutes later, Bubba walked into Mekler's yard and started yelling again. Mekler told Bubba he needed to go home. Mekler then went to her bedroom and got the shotgun, moving it to her living room, but did not take it outside. When she went back outside, Bubba started coming up the walk and Mekler's dog was "going crazy." Mekler told Bubba to stop because the dog would bite him. Mekler grabbed the dog, and that is when she saw a knife in Bubba's hand. Mekler told Bubba he could not come up there with a knife in his hand. Bubba stated the knife was for the dog. Mekler told him "You can't come on the porch with a knife in your hand like that." She told Bubba to leave again and that she would walk to the store and call the police. Mekler stated, however, that she was not going to leave to go to the store because she was afraid of what Bubba might do to Robette. Mekler further stated that she was really afraid for both Robette and herself. Mekler turned around to get the gun, but before she did, she told Bubba to leave. She then retrieved the gun and brought it out on the porch. Bubba was standing on the walk, but was not as close as he was when Mekler went into the house. Mekler stated, "He wouldn't leave, and I wasn't trying to shoot him, and I didn't mean for the gun to fire, but I did cock the gun, and I must have had my finger on the trigger. When the gun went off, it shocked me. Robette said, Jackie, you shot him. I said, no, I didn't. She said, yes, you did. And I said, there's no way." Robette

again said that Bubba was shot and Mekler told her to go call 9–1–1.

The State presented the testimony of Robette Spires at the trial. Robette testified that she and Mekler were drinking alcohol on Mekler's front porch on the night in question. It was after dark when Bubba drove up to Mekler's house in his pick-up truck. Bubba got out of the truck and started hollering, wanting to know why she had not called him back. Robette stated Bubba "was crying, he was upset, it wasn't a violent, mean (sic)." He was asking why she had not called him, why she was doing this, and why she would not come home. Bubba came into the yard but did not come onto the porch. Robette did not remember Bubba ever cursing, threatening or putting his hands on either her or Mekler. Robette did not remember at what point the knife came out, but she did remember Bubba saying it was for the dog. During his first trip to the house when Bubba was hollering and crying at Robette, Mekler started hollering back at Bubba telling him to calm down, and if he did so, he could join them for a drink. At one point Mekler told Bubba, "You can't be hollering here, you can't scream, you've got to go, I'm going to shoot you if you don't." Robette claimed she never had the chance to respond to Bubba's questions because when Bubba would scream, Mekler would scream. Bubba finally got in his truck and left, but a few minutes later, he came walking back up the street, apparently having left his truck at Robette's house. When he returned, Bubba was still crying and hollering, saying the same things as before. Robette testified she was embarrassed by Bubba's behavior and then irritated because she could not "get a word in between [Bubba and Mekler]." When Bubba came back the second time, the dog was chained to the porch and was barking. Bubba made it to the steps, but could come no further because the dog would have reached him. When Mekler saw the knife, she told Bubba to put it away. Bubba responded that the knife was for the dog. At that point, Robette claims she stood up and began walking away, toward her home. She did not remember seeing Mekler go inside to get the shotgun, but she remembered seeing her come out with the gun. Robette stated she was leaving because Bubba and Mekler were hollering and she had "had enough." She stated she did not

think Mekler would use the shotgun. At the moment the shot was fired, Robette had stepped off the porch and was heading away and did not actually see Mekler shoot Bubba. Robette saw a flash of light over her shoulder and as she turned, Bubba said, "She shot me." Bubba began walking toward Robette. He told her he loved her, and then fell to the ground.

Mekler took the stand and testified in her own defense. She stated that on the night of the incident, she and Robette were on her porch talking when Bubba pulled into her yard, jumped out of his truck, and began screaming and hollering at Robette. He was yelling, "Why aren't you home, why are you here, why do you keep doing this to me?" Robette walked down into the yard to talk to him, but Bubba continued to scream and yell. He started flailing around, and may have hit the truck. Mekler stated she became afraid Bubba was going to hit Robette. Mekler did not call the police because she did not have a phone, and she did not walk to the store to use the phone because she was not going to leave Robette "with [Bubba] in that state." At some point Bubba left, driving down the street. Robette and Mekler sat back down and Robette told Mekler Bubba had pulled into Robette's yard and that he was expecting Robette to come up there. Mekler told her not to go there yet, but to let him calm down, stating to Robette that she was scared for Robette to go up there. Robette then said she would not go up there. As they were sitting on the porch, Mekler's dog "Fuzzy" began to bark. Fuzzy was sitting in a chair and was chained to the porch. The dog got up and was "looking in that direction" barking when Robette said, "there's Bubba." Mekler looked and observed Bubba walking quickly into her yard, coming up the walk. As Bubba reached the steps, Fuzzy jumped down the steps and stopped Bubba's momentum. Mekler stepped down and grabbed Fuzzy saying to Bubba, "What are you doing? Have you lost your mind?" Bubba was still screaming and hollering at Robette, "You're going to come with me. Why are you still here?" Mekler told Bubba he needed to go home. Bubba would not back up any farther, so Mekler reached down to grab Fuzzy with her other hand. As she did, she noticed the knife in Bubba's hand. Mekler asked Bubba, "What is wrong with you? You pull a knife on me?" Bubba

replied the knife was for the dog. Mekler then stated, "Bubba, the dog is between me and you." Bubba then said, "Well, she's my wife, and ... I'm going to get her." Mekler replied, "No, you're not." She told Bubba to calm down and that he needed to go home. She told him, "You can't come on the porch like that, with a knife." Bubba said, "That's my wife and I will do what I want to with her." Mekler again told Bubba he would not, and that he needed to leave. Mekler handed the chain on Fuzzy to Robette. Robette asked Bubba why he pulled a knife, and at that point, Mekler stepped inside and got her shotgun. Mekler testified she retrieved the shotgun because there was no stopping Bubba, she had pleaded with him to leave, he came back to her home on foot, she was scared, and he had told her there was nothing that was going to stop him from coming on the porch. When Mekler came back out with the shotgun, Bubba had stepped back about a foot. She had already told Bubba earlier that she kept a loaded gun, and he was still standing there, holding the knife. Mekler told him to "please go home." Bubba stated that he was not going anywhere, he was going to come up on the porch, and he was going to get Robette and did not mind going through Mekler to get her. Mekler stated she was really scared, and at some point, she cocked the gun. As she was cocking the gun, Bubba leaned to the right and the gun fired. Mekler stated she did not remember pulling the trigger. Robette said, "Jackie, you shot him." Mekler told her, "No, I didn't." Robette said, "Yes, you did." Mekler again replied, "No, I didn't." When Robette again stated that she had shot him, Mekler told Robette to call 9–1–1.

On cross-examination, the solicitor asked Mekler if she meant to shoot Bubba. Mekler responded that she "meant for [Bubba] to stop." When asked again if she meant to shoot him, Mekler stated, "I wanted to live." She further stated, "I would never want to shoot anybody." The solicitor again asked her if she meant to shoot Bubba. Mekler testified that she got the gun, she cocked the hammer, she wanted to live, and that she wanted Robette to live. The solicitor again asked Mekler whether she meant to shoot him or she did not mean to shoot him. Mekler replied that she was scared, that Bubba would not stop, that Bubba moved, "and then the gun fired." Mekler stated that when she advised Bubba she had a

gun, she did not contemplate using it at that point, but was just trying to scare him. Neither did she contemplate using it when she went inside and moved it from her bedroom to a place near the front door. The solicitor asked Mekler why she pointed the gun at Bubba with the hammer cocked back and her finger on the trigger if she did not intend to shoot Bubba. Mekler stated she did not have the gun at shoulder level and did not have it pointed at him. Rather, she claimed she had the gun resting on her hip in order to cock the hammer back. When asked by the solicitor if she was "defending this case on the grounds that [she] had to kill him," Mekler replied, "Yes." The solicitor then stated, "you're telling me that you didn't mean to shoot him, and that you had the gun down here?" Mekler replied that she was trying to cock the gun. The solicitor stated Mekler must have had her finger on the trigger and Mekler replied that her finger must have slipped "and got on the trigger," and that she did not remember pulling the trigger.

## LAW/ANALYSIS

### I. Failure to allow evidence to impeach Robette

Mekler first contends the trial judge erred in failing to allow her to impeach Robette, after Robette denied on the stand that she had ever been afraid of Bubba, with evidence Robette told a police officer during a prior dispute that she was afraid of Bubba and that Bubba had threatened to kill Robette. Mekler argues the evidence was relevant to the credibility of Robette and therefore the trial judge erroneously excluded the evidence. We disagree.

During defense counsel's cross-examination of Robette, he asked if it was her testimony that she was not afraid of Bubba the night of the shooting. Robette replied that she was not. She testified she was mad at him for hollering at her, but she was not scared. Counsel then asked Robette if she had been scared of Bubba before. Robette denied that she had ever been scared of him, claiming she had only been mad at him. At this point, the trial judge excused the jury and counsel informed the court he wished to inquire about an incident at Robette's home on December 29, 2001, about two months and nine days prior to this shooting incident. When the court

inquired as to the relevance, counsel stated Robette had testified she was never afraid of Bubba, but he had a report that clearly stated that she was, and the issue was relevant to Robette's credibility. The court then allowed counsel to proffer the evidence. Robette testified in an in camera hearing that her mother had been the one to call the authorities the past December. Robette admitted she told the officer that Bubba had threatened to kill her, but denied telling him she was afraid for her life. She stated she had explained to the officer that she was angry because Bubba put a hole in her door. She stated Bubba was drunk at the time, but she was not scared of him. When counsel began to read from a police report on the incident that Robette indicated she was frightened of Bubba, the court cut counsel off, telling him the issue was an ancillary issue that had nothing to do with the issues in the case.

Counsel again argued to the court that the issue went to Robette's credibility and asked to proffer the officer's testimony. Detective McCord then testified in camera, stating he remembered going to Robette's home on December 29, 2001. Robette told him that Bubba had threatened to kill her and that she was afraid. When Bubba returned to the home he was very boisterous and, using profanity, said he wanted Robette to come outside. At that point, Detective McCord placed Bubba under arrest for criminal domestic violence. Bubba was subsequently convicted as charged. The trial judge ruled it was a collateral issue, it could unduly lengthen the trial, and it might confuse the jury. He determined it had no bearing on any issue in the case at that time and refused admission of the evidence based on Rule 403, SCRE.[2] Robette's cross-examination resumed and she testified that Bubba was not vicious and was not "normally a violent person of any kind." She claimed that his beating on her door was the worst thing Bubba had ever done and it made her angry, but he was drunk at the time and he was not a violent person.

2. This rule provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

On appeal, Mekler contends the trial judge erred in excluding the impeachment evidence. She argues the evidence was admissible under Rule 608(c), SCRE, and because it was proper cross-examination under the rule, the trial judge abused his discretion in denying its admission. We disagree. First it must be noted that Rule 608(c) provides, "Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." Here, Mekler did not proffer the evidence to show "bias, prejudice, or any motive to misrepresent" on the part of Robette. Rather, counsel continuously stated he was offering the evidence to generally attack Robette's credibility. Thus, Mekler cannot rely on Rule 608(c) to show the evidence was proper.

Further, we note case law supports our finding that the trial judge committed no error in denying the admission of this evidence. In *State v. Beckham*, 334 S.C. 302, 320–21, 513 S.E.2d 606, 615 (1999), appellant asserted on appeal that the trial judge erred in excluding impeachment evidence of certain phone calls conceivably made by a witness to a Myrtle Beach business after the witness testified that he had not been in contact with anyone from that business for a year or more prior to the trial. Appellant wanted to impeach the witness with these phone records. Our Supreme Court found no error in the exclusion of evidence of the telephone calls holding "[w]hen a witness denies an act involving a matter collateral to the case in chief, the inquiring party is not permitted to introduce contradictory evidence to impeach the witness." *Id.* at 321, 513 S.E.2d at 615. In the case at hand, because Robette denied she had ever been scared of Bubba, and because this was a matter collateral to the case in chief, there was no error in the trial judge's refusal to allow Mekler to introduce contradictory evidence to impeach Robette.

## II. Refusal to allow evidence of appellant's knowledge of decedent's prior act of violence

 Mekler next contends the trial judge erred in refusing to allow evidence that Mekler was aware of Bubba's prior act of violence against Robette and Robette's property, arguing the evidence was relevant to Mekler's claim of self-defense and defense of others. We agree.

During direct-examination, Mekler testified she knew of Bubba's reputation for peace and good order and that it was both good and bad. Counsel then asked Mekler whether she was aware of an incident that occurred as a result of which Bubba was convicted of criminal domestic violence. Mekler testified that she was aware of it. On cross-examination, the solicitor questioned Mekler about the events of the night of the shooting. He asked Mekler why she did not simply go inside her home and lock her door during the incident with Bubba. Mekler responded, "because I knew he would beat in my door, too, and come in." When asked by the solicitor if locking the door and having the shotgun in the house would not have helped, Mekler stated it would not, because "a door would not stop him."

Following his redirect-examination of Mekler, defense counsel asked to proffer some testimony from Mekler regarding her specific knowledge of Bubba having broken the door in Robette's home. The trial judge indicated he would allow the proffer, but he would not let the evidence go before the jury because it was a collateral issue that would unduly lengthen the trial and was not necessary to any issue in the case. He noted he had allowed Mekler to testify that she was aware of Bubba's criminal domestic violence conviction, but he would not allow evidence of the details of the crime. Thereafter, counsel proffered testimony from Mekler that she first became aware of the criminal domestic violence incident involving Bubba and Robette when she heard Bubba "beating in [Robette's] door" from her house. She later learned Bubba had been drinking when he went to Robette's house, threatened Robette, and beat Robette's door until he broke through it with his fists. She became aware that Bubba was arrested for the incident and was later convicted. The trial judge stated, "I specifically decline to permit that testimony."

In *State v. Day*, 341 S.C. 410, 535 S.E.2d 431 (2000), our Supreme Court found the trial judge committed reversible error by excluding testimony of a past violent act that was closely related in time and occasion to the homicide in that case. Specifically, Day, who was claiming self-defense in his prosecution for the murder of Renew, sought to introduce evidence that Renew had previously held a gun to the head of witness Szumowicz for eighteen hours as he drove around

Aiken County, accusing Szumowicz of being involved with others in a drug trafficking scheme at his residence. *Id.* at 420, 535 S.E.2d at 436. The trial judge ruled that specific instances of Renew's conduct were inadmissible, but allowed Szumowicz's opinion testimony as to whether Renew was a violent person. *Id.* The Supreme Court stated that "[i]n the murder prosecution of one pleading self-defense against an attack by the deceased, evidence of other specific instances of violence on the part of the deceased are not admissible unless they were directed against the defendant or, if directed against others, were so closely connected at point of time or occasion with the homicide as reasonably to indicate the state of mind of the deceased at the time of the homicide, or to produce reasonable apprehension of great bodily harm." *Id.* at 419–20, 535 S.E.2d at 436. The court noted that the prior act of violence against Szumowicz occurred only four months prior to Renew's death, and held the evidence was admissible to prove Day had a reasonable apprehension of violence from Renew, an essential element of his self-defense claim. *Id.* at 421, 535 S.E.2d at 437.

In the case at hand, the prior act of violence by Bubba against Robette occurred less than three months prior to Bubba's death and was so closely connected at point of time to indicate Bubba's state of mind at the time of the shooting. The prior incident of criminal domestic violence was also admissible to prove Mekler had a reasonable apprehension of great bodily harm from Bubba, an essential element of Mekler's claim of self-defense as well as her claim of defense of others.

### III. Failure to charge the jury on the law of involuntary manslaughter

█ Mekler finally contends the trial judge erred in refusing to instruct the jury on involuntary manslaughter. We agree.

At the close of the evidence, defense counsel requested a jury instruction on involuntary manslaughter. The trial judge found there was a strong inference from Mekler's testimony that she "certainly intended to shoot [Bubba]." He noted Mekler said she was afraid of Bubba and was protecting

herself and quoted Mekler as saying, "I meant to stop him." The trial judge thus determined involuntary manslaughter would be an inappropriate charge based on what he "perceive[d] to be self-defense."

The law to be charged must be determined from the evidence presented at trial. *State v. Crosby*, 355 S.C. 47, 51, 584 S.E.2d 110, 112 (2003). A trial court should refuse to charge a lesser-included offense only where there is no evidence the defendant committed the lesser rather than the greater offense. *State v. Chatman*, 336 S.C. 149, 152, 519 S.E.2d 100, 101 (1999). Stated another way, if there is any evidence from which the jury could infer the defendant committed a lesser rather than a greater offense, the trial judge must charge the lesser-included offense. *State v. White*, 361 S.C. 407, 412, 605 S.E.2d 540, 542 (2004).

Involuntary manslaughter is (1) the unintentional killing of another without malice, but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm; or (2) the unintentional killing of another without malice, while engaged in a lawful activity with reckless disregard for the safety of others. *Chatman*, 336 S.C. at 152, 519 S.E.2d at 101. A person can be acting lawfully, even if he is in unlawful possession of a weapon, if he was entitled to arm himself in self-defense at the time of the shooting. *Crosby*, 355 S.C. at 52, 584 S.E.2d at 112; *State v. Burriss*, 334 S.C. 256, 262, 513 S.E.2d 104, 108 (1999). The negligent handling of a gun can support a finding of involuntary manslaughter. *Burriss*, 334 S.C. at 265, 513 S.E.2d at 109.

Here, there is evidence that would support a finding Mekler was lawfully armed in self-defense at the time of the fatal shooting. Further, there is ample evidence from which the jury could infer Mekler did not intentionally discharge the shotgun. Although Mekler stated on cross-examination that she had cocked the gun and "meant for [Bubba] to stop," she clearly testified on direct that, as she was cocking the gun, Bubba leaned to the right "and the gun fired." Mekler specifically testified she did not remember pulling the trigger. Mekler also consistently maintained in her statements to police that she did not remember pulling the trigger. In her detailed statement taken at the Sheriff's Office, Mekler stated

she was not trying to shoot Bubba, and did not mean for the gun to fire. She indicated when the gun went off, it shocked her. Mekler also consistently stated that when Robette told Mekler she had shot Bubba, Mekler replied in disbelief that she had not. She further testified during cross-examination that her finger must have slipped "and got on the trigger," and that she did not remember pulling the trigger.

In *Crosby*, the facts showed Crosby was involved in an incident with a group of people when the victim began charging at Crosby with his hand behind his back. Crosby indicated that he pulled out a gun, closed eyes and pulled the trigger, but he did not know he pulled the trigger. *Crosby*, 355 S.C. at 50, 584 S.E.2d at 111. Our Supreme Court found, in spite of Crosby's admission that he closed his eyes and pulled the trigger, Crosby immediately added that he did not even know that he pulled the trigger. The fact that there may have been evidence showing the shooting was intentional did not negate the other inferences that could be drawn from all the evidence. Thus, the court found Crosby was entitled to a jury charge on the law of involuntary manslaughter. *Id.* at 53, 584 S.E.2d at 112–13.

We likewise hold, given the evidence adduced at trial, Mekler was entitled to have the jury charged on the law of involuntary manslaughter. Because there is evidence from which the jury could have inferred Mekler did not intentionally discharge the shotgun, the trial judge erroneously concluded an involuntary manslaughter charge was precluded by Mekler's self-defense claim.

## CONCLUSION

Based on the foregoing, we hold the trial judge erred in excluding testimony of the past violent act by Bubba that was closely related in time and occasion to the shooting death of Bubba. We further hold the trial judge erred in failing to instruct the jury on the law of involuntary manslaughter. For the foregoing reasons, Mekler's murder conviction is

**REVERSED AND REMANDED.**

ANDERSON and WILLIAMS, JJ., concur.