# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

John Christopher Hart, Appellant.

Appellate Case No. 2017-001291

---

Appeal From Lexington County
Eugene C. Griffith, Jr., Circuit Court Judge

---

Opinion No. 5896
Heard December 12, 2019 – Filed March 2, 2022

---

## AFFIRMED

---

Appellate Defender Joanna Katherine Delany, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and
Assistant Attorney General Caroline M. Scrantom, all of
Columbia, for Respondent.

---

**MCDONALD, J.:** John Christopher Hart appeals his murder conviction, arguing
the circuit court erred in (1) allowing the State to make comments in closing
argument that could only arouse the passions and prejudices of the jury; (2)
admitting into evidence incriminating statements Hart made in response to
questioning when he was in custody but had not yet been given *Miranda* warnings;

and (3) denying Hart's motion for a continuance despite the State's discovery tactics.  We affirm Hart's conviction.

**Facts and Procedural History**

Shortly before midnight on April 10, 2013, Robert Greenberg was driving his tow truck down Greenwood Drive in Lexington County, when he heard what he believed to be a gunshot.  Greenberg found Paula Justice (Victim) bleeding and unresponsive on the side of the road.  Victim was later pronounced dead at Lexington Medical Center.  An autopsy revealed she died from a gunshot wound to the head.[1]

The Lexington County Sheriff's Department determined Victim, a confidential informant for Richland County,[2] lived at the America's Value Inn and had recently called and texted one of her cell phone contacts listed as "KG."  The Sheriff's Department considered KG a potential suspect because patrons at the Inn identified him as the last person seen with Victim on the day she was killed.  Investigating officers ultimately identified "KG" as Hart and issued a warrant for Hart's arrest.

On April 19, 2013, Hart was found and taken into custody in Utica, New York, on the murder warrant.[3]  When Lexington County investigators learned Hart was in custody, Sergeant Roy Mefford contacted the agent in New York to "get an idea of Mr. Hart's demeanor and whether or not he was going to speak with me."  The next day, officers Sean Spivey and Christopher Stout went to New York to interview Hart and transport him back to Lexington County.

---

[1] Two shell casings from a .45 caliber semiautomatic handgun were recovered at the crime scene.

[2] Approximately one year before her death, Victim and Jeremy "Munchkin" Washington were arrested and charged with trafficking cocaine, twenty-eight to one hundred grams.  Victim agreed to cooperate against Washington and pled guilty to a lesser trafficking charge (ten to twenty-eight grams).  Her sentencing was deferred and she was released on bond; however, she was killed before she was able to testify against Washington on the drug trafficking charge.

[3] Hart fled to New York, where he has family, because "[he] was nervous and [he] went to the farthest spot [he] could get to."

A Lexington County Grand Jury indicted Hart for Victim's murder.  At Hart's jury trial, the State presented evidence from three cell phones, including a 10:27 p.m. text from Victim to Hart indicating she was waiting for him to arrive on the night she was murdered.

Tevin Deloach testified for the State, identifying himself as Hart's driver on the night of Victim's murder.  According to Deloach, he drove Hart to meet Victim in a Waffle House parking lot, and Hart told Deloach "he was gonna set her up to kill her."  After they picked up Victim, Hart received a phone call from someone instructing him to "hurry up."  Deloach drove the pair to a dirt road and parked the car, and Hart exited with Victim.  The two "got out of the car and walked up the road and [Deloach] heard the gunshot and [Hart] ran back to the car with the gun in his hand."  Hart then yelled for Deloach to "go, go, go" and called someone on his phone to report "it was done."  Hart told Deloach he killed the woman because she was a confidential informant "and Munchkin [Washington] hired him to kill her so he wouldn't have to go to jail."

A jailhouse informant, Deandre Staley, also testified for the State, claiming Hart told him in the recreation yard that he "bodied the bitch" because "she was a CI" who was getting others in the community in trouble.  Hart told the informant that Victim had set up Munchkin, a West Columbia drug supplier whose real name was Jeremy Washington.  Hart wrote Staley a jailhouse letter communicating Hart's belief that Staley would not "snitch on him."

In June 2016, fifteen-year-old Alex "A.J." Wallace gave a written statement to Deputy Spivey, in which he confessed to shooting Victim because she owed him money.  Although Wallace said Hart was with him at the time of Victim's murder, he claimed Hart "had no idea at all" that the shooting was to occur.  Wallace's confession contained numerous inconsistencies, including a misidentification of the murder weapon and Victim's clothing, and no mention of Tevin Deloach.[4]

At Hart's trial, Wallace testified he grew up within "walking distance" from where Victim was found and killed her because she owed him $1250 and refused to answer his phone calls.  Wallace claimed he shot Victim in the back of the head

---

[4] During the State's case, Spivey testified he was unable to corroborate Wallace's confession and that he excluded him as a possible "KG" suspect due to the many inconsistencies in his story.

and then ran back to his house.[5]  In addition to confessing that he murdered Victim, Wallace testified Hart was unaware he intended to kill her.  Finally, Wallace denied he was confessing because Hart asked him to "take" the charge for Victim's murder.  On cross-examination, Wallace denied telling a friend, Terrance Flagler, that he was going to take Hart's charge and that he had been studying the discovery in Hart's case in preparing to testify.

Hart testified in his own defense.  Although Hart admitted he was present at the time and place of the murder—and that he picked up and disposed of the handgun—he claimed he did not know Wallace intended to shoot and kill Victim.  Hart did not deny his involvement in selling drugs and testified he knew he was the last person seen with Victim before her death.  However, he denied ever confessing to shooting her or threatening anyone to keep silent.  He further denied receiving instructions from Washington, his drug supplier, about the need for someone to "take out" Victim, or reporting to Washington that the task "was done."  Hart claimed he fled to New York because he did not want to be asked to snitch about Wallace's involvement in the killing.

Flagler, who was Wallace's co-defendant in a home invasion murder case, testified for the State in reply.  According to Flagler, while they were in jail, Wallace told Flagler that Hart "brainwashed" him, and convinced him to take his charge.

Following the five-day trial, the jury found Hart guilty of murder, and the circuit court sentenced him to fifty years' imprisonment.

**Standard of Review**

"A trial judge is vested with broad discretion in dealing with the range of propriety of closing argument, and ordinarily his rulings on such matters will not be disturbed."  *State* v. *Northcutt,* 372 S.C. 207, 222, 641 S.E.2d 873, 881 (2007).  "The trial court's discretion will not be overturned absent a showing of an abuse of discretion amounting to an error of law that prejudices the defendant."  *State v. Copeland*, 321 S.C. 318, 324, 468 S.E.2d 620, 624 (1996).  "The appellant has the burden of showing that any alleged error in argument deprived him of a fair trial."  *Northcutt*, 372 S.C. at 222, 641 S.E.2d at 881.  "On appeal, the appellate court will

---

[5] At the time of Hart's trial, Wallace was charged in a separate murder, in which he was accused of shooting a homeowner in the head during a home invasion burglary.

view the alleged impropriety of the solicitor's argument in the context of the entire record." *Id.* at 324, 468 S.E.2d 620, 624–25.

"The trial judge's determination of whether a statement was knowingly, intelligently, and voluntarily made, requires an examination of the totality of the circumstances surrounding the waiver" of the right to remain silent. *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 247 (1990) (quoting *State v. Doby*, 273 S.C. 704, 258 S.E.2d 896 (1979)). "On appeal, the conclusion of the trial judge on issues of fact as to the voluntariness of a confession will not be disturbed unless so manifestly erroneous as to show an abuse of discretion." *Id.* "Part of the State's burden during [a suppression hearing] is to prove that the statement was voluntary and taken in compliance with *Miranda*." *State v. Creech*, 3l4 S.C. 76, 84, 441 S.E.2d 635, 639 (Ct App. 1993).

**Law and Analysis**

## I. Closing Arguments

Hart argues the circuit court erred in allowing the State to argue in closing that Hart was "pure evil," and "evil walks the streets, evil lives in Lexington County; evil is in this courtroom." While this is strong language, "[t]he relevant question is whether the solicitor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Northcutt*, 372 S.C. at 222, 641 S.E.2d at 881. "The appellant has the burden of showing that any alleged error in argument deprived him of a fair trial." *Id.*

In its closing argument, the State defined "murder" for the jury:

> Murder is the unlawful killing of another with malice aforethought, express or implied. Unlawful killing just means it's not justified, it's not self-defense. Malice aforethought, express or implied. Express means you say it, implied means by your actions. Aforethought means it can be premediated like in this case or it can be just at the moment you pull the trigger. But right before and at the time the trigger is pulled[,] you meant to do it and you meant for her to die. Malice. That's a dark word. That's an evil word. It's a word that talks about, in this case, an execution. Not just ill will between two people, not an argument between somebody that went bad. Not even a

robbery that goes bad, but pure evil.  Evil walks the
streets.  Evil lives in Lexington County.

Hart objected, stating, "The evil characterization is improper."  However, the circuit court ruled it would allow the malice argument and definition because "[m]alice is an element the State's got to prove.  [The prosecutor] can argue what he thinks he's proved."[6]  The State continued its closing argument by again characterizing Hart as evil: "Evil is in this courtroom.  John Christopher Hart, premediated, filled with malice with an evil heart, put a gun to the back of [Victim]'s head, pulled the trigger[,] and left her for dead."

The use of such descriptive language in characterizing a defendant can, when considered in the context of the entire record, result in a denial of due process requiring a new trial.  For example, in *State v. Day*, 341 S.C. 410, 422, 535 S.E.2d 431, 437 (2000), the State repeatedly referenced the defendant's "Outlaw" tattoo, not to establish identity, but to emphasize the defendant's criminal nature.  Considering the repeated characterization, our supreme court explained, "[e]vidence concerning a defendant's tattoo or nickname is not prejudicial when used to prove something at issue in a trial, such as the identification of the defendant."  *Id.*  However, "the State did not use Day's tattoo or nickname for any purpose other than to attack his character."  *Id.* at 422, 535 S.E.2d at 437–38.  "The solicitor repeatedly referred to Day as an 'outlaw' in her closing argument in order to paint a picture of Day as someone who was proud of his status as an outlaw, who felt he was above the law, and who was able to deceive law enforcement by hiding evidence and concocting a story about self-defense."  *Id.* at 422–23, 535 S.E.2d at 437–38.  In concluding "the use of the term 'outlaw' permeate[d] the solicitor's closing argument, infect[ed] the trial with unfairness, and deprive[d] Day of due process of law," the court noted the solicitor used the word "outlaw" twenty three times during her closing.  *Id.* at 423–24, 535 S.E.2d at 438.

Similarly, in *State v. Hawkins*, 292 S.C. 418, 421, 357 S.E.2d 10, 12 (1987), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315

---

[6] In *State v. Gallman*, 79 S.C. 229, 60 S.E. 682, 686 (1908), our supreme court approved the following definition of malice in the context of a murder charge: "It is a wicked condition of the heart.  It is a wicked purpose.  It is a performed purpose to do a wrongful act, without sufficient legal provocation; and in this case it would be an indication to do a wrongful act which resulted in the death of this man, without sufficient legal provocation, or just excuse, or legal excuse."

(1991), the supreme court held the State's forty plus references to the defendant's nickname, "Mad Dog," during the trial's guilt and sentencing phases was "excessive and repetitious use of the term denied appellant the right to a fair trial and infected the sentencing proceedings with an arbitrary factor, in violation of the Eighth Amendment to the United States Constitution and the laws of South Carolina." *But see State v. Tubbs*, 333 S.C. 316, 322, 509 S.E.2d 815, 818 (1999) (holding the State's seven references to defendant's nickname, "Cobra," during closing arguments "did not infect the entire trial with unfairness because it was only used seven times, and one of those times was used to establish identity").

Here, the State used the word "evil" six times in its closing argument. Despite the State's claim that it used evil to define malice, the record reflects that five out of the six times the State referenced "evil" in closing, it was to paint Hart as a person with a propensity to kill—someone the jury should be afraid to have living in their community. *See e.g.*, *Mitchell v. State*, 298 S.C. 186, 189, 379 S.E.2d 123, 125 (1989) ("The solicitor introduced impermissible evidence of 'devil worship' and Mafia membership to suggest that Mitchell was a bad person with a propensity to commit the crime. We find a reasonable probability that, had defendant's character not been improperly placed into issue, the outcome would have been different.").

Nevertheless, our review of the record convinces us that the State's characterizing Hart as "evil" did not prejudice him, nor did the solicitor's comments "so [infect] the trial with unfairness as to make the resulting conviction a denial of due process." *Northcutt*, 372 S.C. at 222, 641 S.E.2d at 881; *see also Copeland*, 321 S.C. at 324, 468 S.E.2d at 624 (holding a solicitors argument "may not be calculated to arouse the jurors' passions or prejudices, and its content should stay within the record and reasonable inferences to it.") The record here supports the State's theory that Hart executed Victim because Washington directed him to kill her in retaliation for her agreement to cooperate against Washington in her work as a confidential informant for Richland County. Because malice is a statutory element the State must prove to sustain a murder conviction, the circuit court did not abuse its discretion in addressing the propriety of the State's closing argument under the circumstances of this case. *See Copeland,* 321 S.C. at 324, 468 S.E.2d at 624 ("The trial court's discretion will not be overturned absent a showing of an abuse of discretion amounting to an error of law that prejudices the defendant.").

## II.    Voluntary Incriminating Statements

Hart next argues the circuit court erred in admitting into evidence incriminating statements he gave in response to questioning by Sergeant Mefford because although Hart was in custody, he had not yet been given *Miranda* warnings.

At a pretrial *Jackson v. Denno*[7] hearing, Sergeant Mefford testified that he called the case agent in New York to "get an idea of Mr. Hart's demeanor and whether or not he was going to speak with me." Instead, the agent offered to put Hart on the phone. Mefford admitted he did now know whether anyone had *Mirandized* Hart before this telephone conversation. On the call, Mefford introduced himself to Hart, asked Hart if he understood what he was being charged with, and asked if Hart would be willing to speak to investigators from the Sheriff's Department if they were to come to New York. When Hart tried to ask about details of the case, Mefford explained he would not discuss any evidence over the phone. Hart then interjected, "How do you charge me with murder? You found a gun with my fingerprints on it?"[8]

After hearing Mefford's testimony in camera along with the arguments of counsel, the circuit court ruled it would allow Hart's statement to Mefford into evidence, finding it was a "voluntary comment" and "not responsive" to Mefford's inquiry.

The United States Supreme Court addressed what constitutes an "interrogation" for *Miranda* purposes in *Rhode Island v. Innis,* 446 U.S. 291 (1980). In formulating a definition of interrogation, the Court noted "the concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Id.* at 299. The Court concluded "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at 300–01. The Court went on to explain the following regarding interrogation:

---

[7] 378 U.S. 368, 444 (1964) (holding "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.")

[8] Although Hart admitted to picking up the gun from the crime scene and disposing of it, law enforcement was unable to recover any fingerprints from the weapon after they recovered it from a pond in Richland County.

That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

*Id.* at 300–02. Turning to the facts of *Innis*, the Court concluded the respondent was not "interrogated" within the meaning of *Miranda*:

It is undisputed that the first prong of the definition of "interrogation" was not satisfied, for the conversation between Patrolmen Gleckman and McKenna included no express questioning of the respondent. Rather, that conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from the respondent was invited.

Moreover, it cannot be fairly concluded that the respondent was subjected to the "functional equivalent" of questioning. It cannot be said, in short, that Patrolmen Gleckman and McKenna should have known that their conversation was reasonably likely to elicit an incriminating response from the respondent. There is nothing in the record to suggest that the officers were

aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest.

*Id.* at 302–03.

In *State v. Howard*, 296 S.C. 481, 486, 374 S.E.2d 294, 286–87 (1988), our supreme court applied *Innis* to determine whether a jailed defendant had been interrogated when he volunteered incriminating information to his federal probation officer, Heyward Polk, prior to being advised of his *Miranda* rights. In concluding Polk did not interrogate Howard, the court explained:

There is no indication in the record that Polk expressly questioned Howard. Neither Howard nor Polk testified that questioning occurred during this visit. Likewise, we find that Polk's actions were not reasonably likely to elicit an incriminating response from the suspect. Howard, feeling remorseful about his criminal activities, volunteered the information without any solicitation from Polk. Howard revealed the other crimes to Polk because he trusted him, and believed Polk could help him consolidate the charges to reduce the punishment.

*Id.* at 489, 374 S.E.2d at 288; *see also State v. Primus*, 312 S.C. 256, 258, 440 S.E.2d 128, 128 (1994) ("The first statement appellant made was 'I didn't do anything.' Appellant 'blurted' out this statement when he first saw the police officer. Because appellant was not being subjected to any interrogation at this point, *Miranda* is inapplicable and the trial judge committed no error in not suppressing this statement."); *State v. Franklin*, 299 S.C. 133, 136, 382 S.E.2d 911, 913 (1989) (holding that "[r]eading or attempting to read the *Miranda* rights form would be communication normally incident to arrest" and does not constitute interrogation); *State v. Thompson*, 276 S.C. 616, 623, 281 S.E.2d 216, 220 (1981) ("Here, the appellant rather than the officer initiated the conversation. Finger-printing is an action normally attendant to arrest and custody. The answers the officer gave to the appellant's questions were not such that he should have known they were reasonably likely to elicit a response from the appellant. Therefore, appellant's *Miranda* rights were not violated.").

The State agrees that Hart was not given his *Miranda* rights prior to or during his telephone conversation with Sergeant Mefford. It is also uncontested that Hart was "in custody" at the time of his statement to Mefford. Despite Hart's custodial status, we find the circumstances of the phone call did not rise to the level of custodial interrogation; Mefford was merely trying to work out the logistics of coming to New York to question Hart and transport him back to Lexington County. Furthermore, Mefford's inquiry was unlikely to evoke an incriminating response—he told Hart he would not discuss evidence over the phone. As Hart was not subjected to the "functional equivalent" of questioning, we find no error in the circuit court's admission of Hart's voluntary, non-responsive statements.

### III. Motion for Continuance

Hart next argues the circuit court erred in denying his motion for a continuance because the State continuously produced untimely discovery in the month leading up to trial, and the State admitted it "had been careful what it turned over." Court's Exhibit 3 is a disk containing copies of the discovery defense counsel was provided from April 2017 up until the trial began on May 22, 2017. It includes potentially exculpatory information, such as an FBI report documenting an interview with "Munchkin" Washington on November 9, 2016, in which Washington stated he "did not hire or ask anyone to kill [Victim]," but "advised that he has stated openly on numerous occasions that he wanted [Victim] dead." The FBI report further notes, "Washington added, 'I have said that I wish someone would murder that bitch.' Washington also advised that others have stated that they were going to 'kill that bitch,' referring to [Victim]."

Before the circuit court, Hart argued,

> But, again, when you look at Court's Exhibit Number 3, the CD that's provided—I mean we can take the time and we can go through it, but if you start to look at the discovery that's been presented starting on April 12th all the way up until the trial date and you start actually going through these discovery packets, there are statements of witnesses that had been in the State's possession for months to four years that had not been turned over until April. Unless the State's gonna say they had turned it over to a previous attorney. I mean, this—and that's why I marked it as—the CD is all—the amount of discovery. There's two different cases. There's the case before April

and the case after April and the amount of discovery has
changed the nature of the case, specifically all the
discussions with Jeremy Washington. In April we find
that—we get the FBI statement saying that he doesn't
know anything about the murder, he doesn't set it up,
then we get another statement later, I think it's maybe
May, I can pull it out, saying, well, maybe I do know
something about it, I might have said something about
paying money and drugs, but he never told me . . . .

. . . .

Okay, so on this Wednesday, a pre-polygraph interview.
Let me be specific. In a pre-polygraph interview with
this person with the FBI Wednesday of this week he says
that he did hire John Hart and that he did—John Hart did
confirm that he killed Paula Justice and that now as of
yesterday I found out this morning Jeremy Washington
has been charged with murder. That's a pretty big chain
of events starting from last Wednesday.

Hart contends this was a highly unusual situation in that Washington was brought
back to South Carolina from California, where he was being held in federal
custody, and charged as a co-defendant in Victim's murder the week before Hart's
trial was set to begin. The circuit court agreed, noting,

The Court: Washington. He's the one that's just recently
been charged with murder because his story changed
very, very recently. How does the State stand on that one
issue? Because I'm guessing that was a total shock to the
State that he finally decided to change his story.

The State: We didn't know what he was gonna say until
we got him here, Judge.

The Court: So he wasn't talked to by the State until y'all
carted him in here from California?

The State: No. He denied involvement on the phone in
California and then we had reason to believe that wasn't

true and asked the U.S. Attorney to polygraph him, they sent a polygraph examiner out there to him, I guess, in April. I'm not sure if it was—April, I believe, sometime at the beginning of April, and that's when he started disclosing the story and that's when we worked on getting the writ and he just came here last Monday, so we had an opportunity to talk with him on Tuesday. He got his attorney appointed Friday.

The Court: All right. Mr. Phillips, your request to continue the case is denied since we were ready in March. I understand there was some additional discovery provided. If when we get to whatever it is there's something that was lately provided in very recent order and you want to argue suppression—or on any of it because of late discovery, certainly I'm gonna give you some latitude on that, but it doesn't seem to me like there was much provided by the State recently other than the changed story of the—Washington. Is it Washington?

Mr. Phillips: Washington.

The Court: Is the co-defendant now?

The State: He's not—well, now he is as of yesterday.

The Court: But anyway there may be some evidence the State would attempt to introduce that you have a real good basis for suppression because of late discovery and I'm certainly gonna consider those very thoroughly, but I think the case is ready to be tried and should go forward, so respectfully, I'm [going to] deny that motion for a continuance.

Hart contends fundamental fairness dictated he be given additional time to prepare for trial after the State supplemented its discovery, arguing he did not have enough time to investigate the 2016 statement from Washington denying he hired anyone to kill Victim, admitting he wanted Victim dead, and confirming others made threats to kill Victim. However, months later—on the eve of trial—Washington inculpated Hart by admitting he hired Hart to murder Victim.

"The denial of a motion for a continuance is within the sound discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion resulting in prejudice." *State v. Meggett*, 398 S.C. 516, 523, 728 S.E.2d 492, 496 (Ct. App. 2012). "Where there is no showing that any other evidence on behalf of the appellant could have been produced, or that any other points could have been raised had more time been granted for the purpose of preparing the case for trial, the denial of a motion for continuance is not an abuse of discretion." *State v. Williams*, 321 S.C. 455, 459, 469 S.E.2d 49, 51–52 (1996).

While the manner in which the State chose to provide discovery here was arguably improper, in light of the lack of resulting prejudice to Hart, we disagree that the circuit court abused its discretion in denying the continuance request. Hart was not prejudiced by the State's late disclosure of Washington's November 2016 FBI statement because Hart had approximately a month prior to trial to investigate Washington's statement that others wanted to kill Victim. Any prejudice to Hart was occasioned by Washington in changing his story, implicating himself, and directly naming Hart as Victim's killer. The State was not responsible for Washington's deception or for the fact that Washington's attorney would not permit him to speak again on the matter once he was charged with Victim's murder. And in light of Washington's admission that he hired Hart to murder Victim, Washington's unavailability to testify likely inured to Hart's benefit.

Moreover, any late disclosure related to Washington did not hamper Hart's ability to present a third-party guilt defense to the jury—Wallace confessed to Victim's murder from the witness stand. The jury simply did not believe the teenager's "confession" or his claim that nobody forced him to take the charge for Hart. As Hart cannot demonstrate he was prejudiced by the late discovery, we find the circuit court did not abuse its discretion in denying his motion for a continuance.[9]

**Conclusion**

For the foregoing reasons, Hart's conviction is

---

[9] Despite our finding on this issue, we note our concern with the State's argument that the "new, supplemental pages . . . were disclosed in April because Washington changed his story in April." The fact that Washington eventually changed his story and was only charged as a co-defendant in the murder shortly before Hart's trial did not alter the State's ongoing duty to timely supplement its discovery responses in compliance with Rule 5, SCRCrimP, and *Brady v. Maryland*, 373 U.S. 83 (1963).

**AFFRIMED.**

**WILLIAMS, C.J. and HUFF, A.J. concur.**