24366

The STATE, Respondent v. Timothy D. ROGERS, Appellant.

(466 S.E. (2d) 360)

Supreme Court

*Deputy Chief Attorney Joseph L. Savitz, III, of S.C. Office of Appellate Defense*, Columbia, *for Appellant.*

*Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Assistant Attorney General William Edgar Salter, III,* all of Columbia; and *Solicitor Walter M. Bailey, Jr.,* Summerville, *for Respondent.*

Heard Oct. 31, 1995.

Decided Jan. 22, 1996.

TOAL, Justice:

This is an appeal of Appellant Timothy Rogers's conviction and subsequent death sentence for murder.

## FACTUAL/PROCEDURAL BACKGROUND

On November 25, 1992, Appellant Timothy Rogers shot nine-year-old Stephanie Burditt in the head. Stephanie died the next day.

Rogers was tried on February 28 through March 5, 1994 for Stephanie's murder. The State sought the death penalty, citing as aggravating factors Stephanie's age and the danger Rogers's action had posed to others. Rogers did not testify during the guilt phase of his trial, although the State introduced into evidence a statement Rogers had made to police after his arrest.

According to Roger's statement, Rogers was speaking on the telephone outside Spell's Grocery Store when Stephanie's father Mike Burditt pulled up in a pickup truck accompanied by his daughter Stephanie and another male, Jimmy Carver. Burditt told Rogers he needed to use the telephone, and Rogers informed Burditt he would be off shortly. Burditt and his friend Carver then began making racist remarks, which Rogers ignored. (R. p. 1236.) However, Rogers could hear Burditt and Carver arguing with Rogers's friend Daxton Patterson. Rogers's girlfriend Tonya Bickham was also present. When Burditt and Carver approached Patterson and Bickham, Rogers "walked over to where [Patterson] and [Bickham] were." (R. p. 1237.) Burditt then "turned around, went back to the truck and pushed his seat up." (R. p. 1237.) It appeared to Rogers that Burditt "was looking for a weapon of some sort." (R. p. 1237.) Rogers asserts he fired a shot in the

air to scare Burditt and Carver. (R. p. 1237.) Apparently that shot killed Stephanie.

Not surprisingly, other witnesses perceived the events of November 25th quite differently. Burditt testified that he stopped at Spell's Grocery Store so that Stephanie could get a sandwich before they went fishing. While at the store, Burditt saw his friend Anthony Riley, and the two of them began to talk. Carver stayed in the truck. While Burditt and Riley were talking, Rogers, Patterson, and Bickham came up behind them. Rogers went to talk on the telephone, but Patterson began to taunt and threaten Riley and Burditt. Riley and Burditt ignored Patterson. When Patterson flicked a cigarette on Riley's shoe, Riley left the store. (R. p. 732.)

According to Burditt's testimony, Burditt then tried to get in his truck to leave, but Patterson prevented Burditt from leaving by pulling on the door of the truck. At some point, Carver got out of the truck and began walking toward the back of it. As Patterson and Burditt struggled by the door, Rogers approached, stepped between them, put a gun to Burditt's head, and said, "I'll kill you." (R. pp. 733-34.) Rogers then lowered the gun and fired a shot that hit no one. As Burditt once again tried to get in his truck, Rogers spit in Burditt's face. (R. pp. 734-35.) When Burditt finally got back into his truck and began to drive away, Rogers fired a shot into the back window of the truck. That shot hit Stephanie, who had been sitting in the truck crying during the incident. (R. pp. 735-37.) Carver's testimony was similar to Burditt's. Carver specifically denied that Burditt had ever reached in the truck for his gun, as Rogers had asserted. (R. p. 949.)

Rogers's girlfriend Bickham testified that Burditt, Carver, Patterson, and Rogers were involved in a heated confrontation, which Patterson had begun. When Bickham turned around to go talk on the telephone, she heard two shots. The second shot was fired as the truck was driving away. (R. p. 833-34.)

Based largely on Roger's statement, defense counsel requested a jury charge on voluntary manslaughter. (R. p. 968.) After discussing the issue with the prosecution and defense counsel, the trial judge refused the instruction. (R. pp. 976, 1019). The jury returned with a verdict of murder.

During the solicitor's closing arguments at the penalty phase, the solicitor asked: "What do you do with a person like this once he's in our midst. . . . ?" (R. pp. 976, 1190.) The solicitor also said that "by his record Timothy Rogers has shown that he cannot safely exist in this society inside *or outside* of the prison system." (R. p. 1193.)

Defense counsel requested a jury instruction informing the jury that if he sentenced Rogers to life in prison, Rogers would never be eligible for parole. (R. pp. 1048-50, 1239.) The trail judge refused the proposed instruction and gave a "plain and ordinary meaning" charge pursuant to *State v. Norris*, 285 S.C. 86, 328 S.E. (2d) 339 (1985). The trial judge sentenced Rogers to death in accordance with the jury's recommendation.

Rogers appeals.

## LAW/ANALYSIS

### I. *Guilt Phase*

Rogers contends that when combined with certain other testimony, his statement to the police contains evidence that could support a finding of voluntary manslaughter. The trial judge refused to charge voluntary manslaughter because he believed that "you can't have voluntary manslaughter when you take the position this was an accidental killing." (R. p. 1031.) Rogers asserts the trial judge erred in refusing to charge voluntary manslaughter. We disagree.

The trial judge's reason for refusing to charge voluntary manslaughter—that one is not entitled to a voluntary manslaughter charge when one contends a killing was accidental—was incorrect. We have previously held that where there is evidence to support charging the jury on either of two offenses (or affirmative defenses), both offenses (or defenses) must be charged, even if the two seem inconsistent. *See State v. Gilliam*, 296 S.C. 395, 373 S.E. (2d) 596 (1988) (finding trial judge erred in refusing to charge both self-defense and voluntary manslaughter because they are mutually exclusive). If there was evidence to support a jury charge on voluntary manslaughter, the trial judge should have charged the jury on both voluntary manslaughter and accident. Therefore, we must determine whether there was evidence to support a charge on voluntary manslaughter.

Voluntary manslaughter is the unlawful killing of another in sudden heat of passion upon sufficient legal provocation. *E.g., State v. Lowry,* 315 S.C. 396, 434 S.E. (2d) 272 (1993). Rogers asserts that the combination of the racist statements allegedly made by Burditt and Carter and Burditt's alleged leaning into his truck constituted sufficient legal provocation. We disagree.

Here, there was absolutely no evidence of sufficient legal provocation. First, the racist statements that Rogers alleges Burditt and Carver made are legally insufficient to constitute such legal provocation because mere words, no matter how opprobrious, are insufficient to constitute adequate legal provocation when death is caused by the use of a deadly weapon. *E.g., State v. Butler,* 277 S.C. 452, 290 S.E. (2d) 1, *cert. denied,* 459 U.S. 932, 103 S.Ct. 242, 74 L.Ed. (2d) 191 (1982). Instead, when death is caused by use of a deadly weapon, offending words must be accompanied by an "overt, threatening act . . . which could have produced the heat of passion." *Lowry,* 315 S.C. at 398, 434 S.E. (2d) at 274. Burditt's allegedly leaning in his truck simply does not constitute sufficient legal provocation.

The cases relied upon by Rogers are clearly distinguishable. In *Lowry,* we found that the trial judge should have charged voluntary manslaughter where the defendant shot the decedent after the decedent taunted the defendant then moved toward him in a menacing fashion with his arms outstretched as if to grab him. *Id.* at 397, 434 S.E. (2d) at 273. The Court found that a jury could reasonably conclude that when taken together, the menacing words and the actions constituted a legal provocation sufficient to produce sudden heat of passion. *Id.* at 398, 434 S.E. (2d) at 274. In *State v. Jackson,* 301 S.C. 41, 389 S.E. (2d) 650 (1990), voluntary manslaughter was properly charged where there was evidence that the decedent approached the defendant, reached into his pocket, and said "I'm come to kill you, bitch." *Id.* at 43, 389 S.E. (2d) at 651. In both *Lowry* and *Jackson,* the threat was clear and overt.

In this case, there was *no* overt threat: According to Rogers's own statement, Burditt was, in fact, moving *away* from Rogers and made no statements evincing an intent to injure Rogers. Furthermore, there was no evidence that Burditt had struck or assaulted anyone. In fact, none of the per-

sons describing the incident, including Rogers himself, points to anything that would indicate an overt threat to Rogers. Given these facts, we find there was no evidence of sufficient legal provocation, and the trial judge did not err in refusing to charge voluntary manslaughter.

## II. *Sentencing Phase*

Rogers next argues that he was entitled to jury charge that if sentenced to life in prison, he would never be eligible for parole. *See Simmons v. South Carolina,* — U.S. —, 114 S.Ct. 2187, 129 L.Ed. (2d) 133 (1994); *State v. Southerland,* 316 S.C. 377, 447 S.E. (2d) 862 (1994), *cert. denied,* — U.S. —, 115 S.Ct. 1136, 130 L.Ed. (2d) 1096 (1995). We agree.

In *Simmons,* a plurality of the United States Supreme Court held that when a capital defendant would be ineligible for parole if sentenced to life in prison and the State argues the defendant's future dangerousness as a basis for imposition of the death penalty, the defendant is entitled to have the jury informed of his ineligibility for parole either by way of arguments by defense counsel or instruction by the trial judge. *Id.* at —, 114 S.Ct. at 2187, 129 L.Ed (2d) at 146. We have since held that the trial judge *must* charge a capital defendant's parole ineligibility when future dangerousness is at issue and the defendant requests such a charge. *Southerland,* 316 S.C. at 382, 447 S.E. (2d) at 868.

Although the State does not seriously dispute that Rogers would have been ineligible for parole if sentenced to life in prison,[1] it attempts to distinguish *Simmons* by claiming that the prosecution argued only that Rogers posed a future danger *to other prisoners,* rather than to free society. We disagree.

During closing arguments of the sentencing phase of Rogers trial, the prosecution certainly argued that Rogers posed a danger to other prison inmates. The prosecution also suggested, however, that Rogers was dangerous to society in general. In fact, the prosecution's closing argument was simi-

---

[1] Rogers was twice convicted of violating S.C. Code Ann. § 16-3-655 (1985) (criminal sexual conduct with a minor), which crimes we find constituted violent crimes within the meaning of the original version of S.C. Code Ann. § 16-1-60, 1986 S.C. Acts 2992, when they were committed in August and September 1992. *See* 1991 Op. Atty. Gen. 91-46, p. 118.

lar in several respects to that used by the prosecutor in *Simmons*. Specifically, the prosecutor in this case asked about Rogers: "What do you do about a person like this once he's in our midst with these two choices [life and death]?" (R. p. 1190.) In *Simmons*, the United States Supreme Court found that the same question, when asked in the same context, raised the issue of the defendant's future dangerousness.

Moreover, the prosecution in the present case made several other statements that raised the possibility of Rogers's future dangerousness to society. Later during closing arguments, the prosecutor alluded to the threat Rogers posed to society, stating that "by his record Timothy Rogers has shown that he cannot safely exist in this society inside *or outside* of the prison system." (R. p. 1193) (emphasis added). Finally, during the sentencing phase, both Rogers and Rogers's pastor testified. The prosecution's cross-examination to both witnesses focused on Roger's extensive criminal record and history of recidivism. (R. pp. 1120-23, 1159-61.) The prosecutor seized on this theme during closing argument, suggesting, in essence, that Rogers was beyond rehabilitation and would always be dangerous:

> This is his criminal conviction record. . . . It's nine convictions, some fairly insignificant and some more important. . . . The idea is that prison is not supposed to be there to punish. They're there to correct you. They're there to reform you. When you come out of prison, you ought to be straightened out and be a better person and be rehabilitated. The problem with Mr. Rogers here is that he went to prison. He wasn't corrected, because when he got out of prison, he went out and he got drunk and he murdered a nine-year-old girl. His stay in prison didn't teach him anything.

(R. pp. 1187-88.) It is clear from these statements that the prosecution raised the issue of Roger's future dangerousness to society as a reason for imposition of the death penalty. Accordingly, *Simmons* applies, and Rogers was entitled to have the jury informed of his parole ineligibility.

The State next contends that even assuming the prosecution raised Roger's future dangerousness, *Simmons* was satisfied because defense counsel informed the

jury during closing arguments that Rogers was parole ineligible. We disagree. Although defense counsel attempted to argue to the jury that "life in prison in this case means life in prison," (R. p. 1197), the trial judge expressly excluded counsel from directly informing the jury of Rogers's parole ineligibility and instructed him not to discuss life or death "except in their plain and ordinary meaning." (R. p. 1201.) Moreover, defense counsel requested a jury instruction on parole ineligibility, but the trial judge refused to give it and instead gave the plain and ordinary meaning instruction from *State v. Norris*, 285 S.C. 86, 328 S.E. (2d) 339 (1985).[2]

Rogers was entitled to a charge on parole ineligibility. Therefore, we reverse his sentence and remand for resentencing.

## CONCLUSION

For, the foregoing reasons, Appellant's conviction is AFFIRMED, but his sentence is REVERSED and the case is REMANDED for a retrial of the penalty phase of the trial.

FINNEY, C.J., MOORE, WALLER and BURNETT, JJ., concur.

---

[2] At the time of Rogers's trial, the United States Supreme Court had not yet issued its opinion in *Simmons*. At that time, therefore, the trial judge was bound by our ruling in *Simmons* and prior cases and gave the *Norris* charge, as was appropriate under the circumstances.