602 S.E.2d 90

**The STATE, Respondent,**

v.

**Byron B. SLATER, Appellant.**

No. 3855.

Court of Appeals of South Carolina.

Heard April 7, 2004.
Filed Aug. 9, 2004.
Rehearing Denied Sept. 23, 2004.

488

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General William Edgar Salter, III, all of Columbia; and Solicitor Ralph E. Hoisington, of Charleston, for Respondent.

BEATTY, J.:

Byron Slater appeals his conviction on a murder charge, alleging, *inter alia,* that the trial court erred in failing to charge the jury on self-defense. We reverse and remand.

## FACTS

Appellant Byron Slater was with some friends on the evening of February 3, 2001, at a school gymnasium where there had been a dance. Following the dance, Slater went outside, where he started talking with "some females." While there, he became aware of a disturbance near a truck. Slater walked to his car, retrieved a gun, and started to walk toward

the truck.[1] Slater then changed his mind. He walked back toward his car, where three friends, Ellis Judon (the driver), Kenyon Nichols, and Deshawn Brown, were waiting for him. Moments later, Slater noticed that another disturbance was taking place in an adjacent parking lot and wanted to see what was going on. Slater asked Judon to drive there.[2] In that second parking lot, an apparent robbery was unfolding. The victim was on the ground, being stomped by five men. Slater knew neither the victim nor his attackers.

Slater testified that he walked up to the robbery and surprised one of the attackers. The man then turned around and pointed a gun toward Slater. Slater quickly turned around and started running back toward his car. As he ran, he heard a gunshot and responded by shooting his own gun behind him. Slater got into the car where his friends were waiting for him.[3] He continued shooting in the air as the car pulled away. In the ensuing chaos, the victim of the attempted robbery lay dying on the ground. He had been shot twice.

Back in the car, Slater said that he thought he had "hit" someone. Slater and his three friends drove to Slater's house, where Slater left the gun. The four then went back to the parking lot where the shooting had occurred. On the way, the police stopped them and searched the car but did not find any weapon.

Early the next morning, detectives from the city of North Charleston went to Slater's residence to arrest him. Following the arrest, they obtained a search warrant for Slater's house. The detectives recovered various ammunitions from Slater's yard and from inside his house, including two guns, some projectiles, bullets, and shell casings.

---

1. Slater testified that he retrieved the gun "to shoot it in the air ... something that young people be doing like after parties or clubs or whatever."

2. There is some dispute as to these facts. Slater contends that he never returned to his car because he realized another confrontation was taking place in another parking lot and walked over there instead, still carrying his gun.

3. Nichols and Brown, too, had gotten out of the car, but apparently returned before Slater.

At the police station, Slater told the police that he "didn't shoot anybody." However, a ballistics expert testified at trial that the fatal bullets came from Slater's gun, as did the ones retrieved from the crime scene. Additionally, numerous witnesses placed Slater at the crime scene with a gun. Slater himself admitted to shooting his gun, but insisted that he did not mean to shoot anyone. The jury convicted Slater of murder, though the trial judge had included a manslaughter option in the jury charge.[4] The trial judge expressly refused to include a self-defense charge.

## ISSUES

I. Did the trial judge err in refusing to include a self-defense charge, reasoning that Slater had brought about the difficulty?

II. Did the trial judge err in allowing the victim's mother to testify that her son did not have a criminal record?

III. Did the trial judge err in allowing a detective to testify that an eyewitness to the crime had denied hearing any gunshot other than Slater's?

## LAW/ANALYSIS

Slater argues that the trial judge committed reversible error in refusing to include a self-defense charge. We agree.

The evidence presented at trial determines the law to be charged. *State v. Goodson*, 312 S.C. 278, 280, 440 S.E.2d 370, 372 (1994). If there is *any* evidence in the record to support self-defense, the issue should be submitted to the jury. *State v. Burkhart*, 350 S.C. 252, 261, 565 S.E.2d 298, 302 (2002); *State v. Hill*, 315 S.C. 260, 261, 433 S.E.2d 848, 849 (1993). A trial judge's failure to do so is reversible error. *State v. Day*, 341 S.C. 410, 416, 535 S.E.2d 431, 434 (2000). Additionally, "[c]urrent law requires the State to disprove self-defense, once raised by the defendant, beyond a reasonable doubt." *Burkhart*, 350 S.C. at 261, 565 S.E.2d at 303 (citing *State v. Wiggins*, 330 S.C. 538, 544, 500 S.E.2d 489, 494 (1998)).

---

4. The jury also convicted Slater on one count of possession of a firearm during the commission of a violent crime.

 For a defendant to argue self-defense, the record must demonstrate that "(1)[he] was without fault in bringing on the difficulty; (2)[he] actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) a reasonably prudent person of ordinary firmness and courage would have entertained the same belief; and (4)[he] had no other probable means of avoiding the danger." *State v. Chatman*, 336 S.C. 149, 153, 519 S.E.2d 100, 102 (1999). Moreover, "[o]ne who provokes or initiates an assault cannot escape criminal liability by invoking self-defense." *State v. Bryant*, 336 S.C. 340, 345, 520 S.E.2d 319, 322 (1999). However, a defendant can restore his right to self-defense if he withdraws from the conflict and communicates that decision to the opponent. *Id.*

Here, there was some evidence to support a self-defense charge. Slater maintains that when he approached the altercation between the victim and his attackers, an attacker pointed a gun at Slater. Slater then turned and ran. While running away, Slater heard gunshots and returned fire, not looking in the direction where he was firing. Slater testified, "when I walked up on him, I guess I surprised him and he turned to me and he had a gun in his hand. And I see his gun and I started running." He added, "Yeah, when I walked up on him like here, like he turned to me, like had the gun pointed at me like he surprised." Additionally, Mark Nelson, a friend of the victim, testified that he saw one of the attackers—someone other than Slater—with a gun.

 The State insists that Slater bears some responsibility for the tragedy because he was in unlawful possession of a gun and carried that gun into the altercation. However, the mere unlawful possession of a firearm, with nothing more, does not automatically bar a self-defense charge. *See State v. Burriss*, 334 S.C. 256, 262, 513 S.E.2d 104, 108 (1999) (explaining that "a person can be acting lawfully, even if he is in unlawful possession of a weapon"). As importantly, Slater testified that he turned and started to run *away from* the attacker holding the gun. Therefore, even if Slater initially contributed to the difficulty, that he turned and ran away would restore his right to self-defense. *See Bryant*, 336 S.C. at 346, 520 S.E.2d at 322 (explaining that an appellant's attempt to leave the scene of a confrontation would signal that the "appellant truly intended

to withdraw" from the situation). *See also State v. Rogers,* 320 S.C. 520, 525, 466 S.E.2d 360, 363 (1996) (reasoning that Rogers faced no overt threat because his opponent was moving away from him and said nothing to evince a threat).

The dissent contends that Slater "provoked a conflict by running toward an altercation while conspicuously holding a cocked and loaded gun." The record provides otherwise. Slater testified, "I walked up on [the attacker] ... [the gun] was by my side ... in my right hand." That testimony is uncontroverted. The dissent apparently assumes that (1) one of the attackers saw Slater's gun; (2) was afraid for his own safety; and (3) started to shoot as a result. That scenario is plausible, but the record fails to establish it.[5] It is just as likely that Slater's gun was inconspicuous, especially given that the regrettable events of that evening occurred when "it was pretty dark" and that Slater had his gun by his side.

Citing *Bryant,* the dissent argues that "Slater failed to effectively communicate his intent to withdraw" to the attacker with the gun. We disagree. In *Bryant,* the victim apparently caught the appellant breaking into the victim's truck. *Id.* at 343, 520 S.E.2d at 321. The two struggled, and the appellant stabbed the victim to death with a screwdriver. *Id.* at 344, 520 S.E.2d at 321. The appellant argued that he was entitled to a self-defense charge because he had dropped his knife to the ground before the fight began. *Id.* According to him, that gesture indicated his intent to withdraw and restored his right to self-defense. *Id.* Our supreme court rejected the argument.

The court initially found that the appellant brought on the difficulty because the attempted break-in was "in violation of law and reasonably calculated to produce the occasion." *Id.* at 345, 520 S.E.2d at 322. The court clarified, however, that, " '[i]f, after commencing the assault, the aggressor withdraws in good faith from the conflict and announces in some way to his adversary his intention to retire, he is restored to his right of self-defense.' " *Id.* (citation omitted). In that case, the appellant himself admitted that the victim did not see him

---

5. The men involved in the robbery were apparently never apprehended. They did not participate in the proceedings, so what they may have seen is unclear.

drop the knife, and therefore could not have known about the alleged withdrawal. The court reasoned, as said earlier, that "[i]f appellant truly intended to withdraw he could have easily left the open parking lot." *Id.* at 346, 520 S.E.2d at 322.

Here, Slater merely walked toward the altercation; he threatened or assaulted no one.[6] More importantly, Slater immediately "turned and ran" after seeing the attacker's gun. Slater did exactly what the supreme court looked for in *Bryant:* he left—quickly.

Admittedly, as the dissent posits, the attacker may have thought that Slater was withdrawing simply "to gain [some] tactical advantage." However, our task is not to determine the attacker's state of mind. Rather, as instructed by our supreme court, we are to see only whether "any evidence" in the record supports a self-defense charge.[7] *Day,* 341 S.C. at 416, 535 S.E.2d at 434. We find that there is some. The trial judge, therefore, erred in not including the charge.

Having found that the exclusion of the requested self-defense charge was error, we need not address Slater's remaining issues.

## CONCLUSION

Based on the foregoing, we **reverse** and **remand** for a new trial on both charges.[8]

ANDERSON, J., concurs and HEARN, C.J., dissents separately.

---

6. If the gun was indeed inconspicuous (see earlier discussion), it is difficult to imagine how Slater's act of walking toward the robbery was "in violation of law and reasonably calculated to produce" the difficulty. The cases cited by the *Bryant* court all involved robbers or other felons claiming self-defense when the would-be victims tried to defend themselves. *See id.* at 345, 520 S.E.2d at 322.

7. Additionally, the supreme court cautioned that "a trial judge should specifically tailor the self-defense instruction to adequately reflect the facts and theories presented by the defendant." *Day,* 341 S.C. at 418, 535 S.E.2d at 435.

8. *See Burkhart,* 350 S.C. at 264, 565 S.E.2d at 304 (ordering a new trial on charges of possession of a firearm during the commission of a

494

HEARN, C.J., dissenting:

Because Slater failed to effectively communicate his intent to withdraw after he provoked a dangerous situation, I do not believe he was entitled to a charge of self-defense. Therefore, I respectfully dissent.

A person who provokes an assault cannot claim a right to self-defense unless that person " 'withdraws in good faith from the conflict and announces in some way to his adversary his intention to retire.' " *State v. Bryant,* 336 S.C. 340, 345, 520 S.E.2d 319, 322 (1999) (quoting 55 A.L.R.3d at 1003). Here, all the evidence, including Slater's own testimony, indicates that he provoked a conflict by running toward an altercation while conspicuously holding a cocked and loaded handgun, even though he had no personal connection to the people involved in the fight.[9]

Slater argues that he withdrew from the conflict because (1) he began to run when a man involved in the turmoil pointed a gun at him, and (2) he did not shoot his gun until he heard someone else fire first. However, in his testimony, Slater admitted that the events—his running, hearing the shot, and firing back—all "happened so fast." Slater further admitted that he not only shot backwards as he was running away, but that he also shot in the air after he had gotten inside a car and was riding away from the scene. In my view, even if Slater intended to withdraw, neither his words nor his actions communicated this intent. *See id.* ("One's right to self-defense is restored after a withdrawal from the initial difficulty with the victim if that withdrawal is communicated to the victim by word or act."); *State v. Graham,* 260 S.C. 449, 196 S.E.2d 495 (1973).

While the trial court is required to charge the jury on self-defense if there is any evidence supporting the charge, all the evidence in the record shows that Slater provoked a dangerous situation and no evidence indicates that he ever communi-

violent crime after overturning the underlying conviction on the violent crime).

9. Slater made no claim of "defense of others at trial," nor did his testimony in any way reflect an intention to enter the conflict in defense of those being attacked.

cated his withdrawal after the provocation. Despite Slater's claim that he attempted to retreat, he admitted that he still had a cocked and loaded gun in his hand. With a dangerous weapon readily available for Slater to use, the person whom Slater had approached could not have known whether Slater was withdrawing from the conflict or whether Slater was retreating to gain tactical advantage. *See* 40 C.J.S. *Homicide* § 125 (1991) ("As long as a person keeps his gun in his hand prepared to shoot, the person opposing him is not expected or required to accept any act or statement as indicative of an intent to discontinue the assault."); *see also Bryant*, 336 S.C. at 346, 520 S.E.2d at 322 (finding the defendant failed to effectively communicate his withdrawal even though he threw down his knife because the defendant admitted the victim did not see him drop the knife). Because Slater failed to communicate his intent to withdraw, his right to use self-defense was never restored. Therefore, I find no error in the trial court's refusal to charge self-defense.

Because I disagree with the majority's decision to reverse on the failure to charge self-defense, I briefly address Slater's additional arguments on appeal. In addition to his argument regarding self-defense, Slater also contends the trial court erred by allowing the victim's mother to testify that her son did not have a criminal record.

Rule 404(a)(2), SCRE, states that although character evidence is generally not allowed, "[e]vidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case [is admissible when it is used] to rebut evidence that the victim was the first aggressor." Here, because the gist of Slater's defense at trial was that he had been shot at first, evidence regarding the victim's character was properly offered to rebut the inference that the victim may have been the initial shooter.[10] Therefore, I find no error in the trial court allowing this testimony.

Slater's final argument on appeal is that the trial court erred by admitting hearsay testimony of a police officer. I disagree.

---

10. After the victim's mother testified, Slater presented testimony that powder residue on the victim's hands could have resulted from the victim firing a weapon, further indicating that the defense's strategy was to implicate the victim as the initial shooter.

At trial, Deshawn Brown, who was accompanying Slater on the night of the incident, testified he heard a gunshot earlier in the evening when he and Slater were "standing by the school by the gym." On redirect examination, Brown testified that he remembered giving a statement to the police. When asked whether he told the investigating officers that he heard gunshots earlier that night, Brown replied that he did not. Brown explained that he never told anyone about the gunshots he heard because, until the trial, he had never been asked about hearing any other gunshots that night.

At a later point in Slater's trial, the State questioned one of the officers who had questioned Brown, and the following exchange occurred:

Q: Did you ask them about guns at the scene of the crime?

A: Yes, I did.

Q: Did you ask them about anybody else shooting at the scene of the crime?

A: Yes, I did.

Q: Well, when you were interviewing Deshawn Brown, did he ever tell you that he heard anybody else shooting out there?

Defense Counsel: Objection, your Honor, that's not proper.

The Court: No, sir, I will—no, sir, I'll permit that question. Go ahead.

Q: Did he ever tell you that?

A: I interviewed Deshawn Brown. He never once told us about anybody else shooting at the scene.

Slater contends on appeal that the above testimony was inadmissible hearsay because it refers to a statement "other than one made by the declarant while testifying at trial or hearing, offered into evidence to prove the truth of the matter asserted." *See* Rule 801(c), SCRE.

While the above testimony regarding the statements of Brown is hearsay, we find that it is admissible under Rule 613(b), SCRE. This rule provides, in pertinent part:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is advised of the substance of the statement, the time and place it was allegedly made, and the person to whom it was made, and is

given the opportunity to explain or deny the statement. If a witness does not admit that he has made the prior inconsistent statement, *extrinsic evidence of such statement is admissible.*

Rule 613(b), SCRE (emphasis added). When a witness is presented with the requisite circumstances surrounding an alleged inconsistent statement and nevertheless continues to deny before the court ever making the statement, another person's testimony that the witness did, in fact, make that statement is admissible under Rule 613(b), SCRE. *See State v. Fossick,* 333 S.C. 66, 69–70, 508 S.E.2d 32, 33 (1998).

In the case before us, the investigating officer testified that he asked all the witnesses (including Brown) about whether anyone else was shooting a weapon at the scene of the crime. He testified Brown had not told him about anyone else shooting. Because Brown denied ever being asked this question after he was presented with all the requisite circumstances, the officer's testimony constituted extrinsic evidence of a prior inconsistent statement and was admissible under Rule 613(b). Thus, the judge acted properly in overruling Slater's objections to the testimony.

Accordingly, based on the foregoing, I would affirm Slater's conviction.