J-S26005-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LIONEL SENTEL MCRAE | : | |
| | : | |
| Appellant | : | No. 178 MDA 2025 |

Appeal from the Judgment of Sentence Entered October 24, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0003771-2021

BEFORE:  LAZARUS, P.J., OLSON, J., and BECK, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED: AUGUST 12, 2025**

Lionel Sentel McRae appeals from the judgment of sentence, imposed in the Court of Common Pleas of Dauphin County, following a bifurcated jury trial after which he was convicted of two counts of attempted murder and one count of persons not to possess a firearm.  Counsel has filed a motion to withdraw and an accompanying **Anders**[1] brief.  After our review, we affirm McRae's judgment of sentence and grant counsel's motion to withdraw.

On June 3, 2021, William Thach and his then-girlfriend, Sharlette Hill, went out with McRae, who is Hill's "cousin,"[2] to shoot pool.  **See** N.T. Trial, 8/14/24, at 403, 405-06.  Before going to the pool hall, they stopped at a bar

_____

[1] **Anders v. California**, 386 U.S. 738 (1967).  **See also Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).

[2] Hill testified that she does not know whether she and McRae are related by blood but used the term "cousins" in the street sense.  **See** N.T. Trial, 8/14/24, at 460.

named Tops for a few drinks. *Id.* at 408. Thereafter, the threesome proceeded to Club Med, a billiard hall, which was a two-minute drive from Tops. *Id.* at 413. Thach and McRae proceeded to play pool and the three of them "chitchat[ted] back and forth.[]" *Id.* at 414. Thach estimated that they remained at Club Med for between one and two hours. *Id.*

After leaving Club Med, the three drove to Sheetz to get some drinks. *Id.* at 415-16. From there, they drove to the Washington Square Apartments, where McRae was staying. *Id.* at 416. Thach was driving, Hill was in the passenger seat, and McRae was in the back seat. *Id.* at 419. Upon arriving at Washington Square, Hill exited the vehicle to use her sister's bathroom.[3] Thach and McRae remained in the vehicle; Thach asked McRae if he was okay, as McRae had been drinking and was leaning back in his seat. *Id.* at 420.

Hill returned to the vehicle, which Thach then reparked in a parking spot. *Id.* at 421. The three proceeded to "drink some more." *Id.* While they were drinking, Hill said certain things related to Thach's father to "push[ Thach's] buttons," but Thach did not get upset because "she always says [things like that]." *Id.* at 424. Thach testified as follows regarding what occurred next:

> A: So[,] me and [Hill are] talking and I'm facing her and we're talking, like, we're just, like, you know, talking. And I don't know what happened, but everything went black, you know, like—and then, like, I slump over. All I hear is [Hill saying "]why would you do that? Why would you shoot him?["] And then that's it. That's all I remember, because I'm—right now everything's black[.]

_____

[3] Hill's sister also resided at the Washington Square Apartments.

. . .

Q:  And then what is the next thing that you remember?

A:  Waking up.  I was pushed over in the passenger seat, bleeding from my head.  I guess because all the blood rushed to my head, like, I tried to pick myself up in the passenger seat.  [McRae is] driving now.  He pushed me over.  Like I'm—like after I got shot . . . I got pushed over, I'm in the passenger seat, [McRae] hopped in the car and he dr[o]ve off and my face is in the passenger seat on the floor.

. . .

So[,] I'm bleeding.  I guess I feel like the blood rushing to my head, so I get, like, you know, a little conscious, so I push myself up in the seat.  So[,] while I'm pushing myself up in the seat, he is driving with a gun to my stomach saying, ["]I'll kill you again if you move.["]  But I'm like, you know, I'm weak.  Like, I guess, I'm in shock from getting shot.  So[,] I'm in the passenger seat with my head like this, but I see . . . the lights going by, . . . stuff like that.

. . .

Then while we're driving, . . . the cops pulled us over because I remember seeing the lights.

*Id.* at 422, 428-30.  Thach testified that he knew it was not Hill who shot him in the head because he was "talking to [Hill] and [he could] see her hands." *Id.* at 436.

Hill testified that she and McRae are "like cousins," as their fathers are best friends and their mothers "grew up as cousins." *Id.* at 460.  Hill stated that she met McRae for the first time about three weeks prior to the incident, but that they had been friends on Facebook. *Id.* at 460-61.  Hill's testimony as to the chain of events leading up to the shooting essentially mirrored that of Thach.  There were numerous gaps in her memory due to intoxication, *id.* at 476-83, but Hill agreed that she may have raised an accusation that Thach's

father previously molested or raped her. *Id.* at 483. Hill then testified as follows:

Q: What was going on in the car at this point?

A: I can't recall what was going on. Again, I was intoxicated. But I don't recall, like, any arguments or fighting or any of that. . . . The first thing I remember is sitting up, looking at [Thach], and [McRae] had a gun pointed to the back of his head and shot him.

Q: Can you describe exactly what you heard or saw?

A: I just remember a gun pointed toward his head and a flash of light, loud sound and smell of gun powder and everything.

Q: Now, at this point, what did [Thach] look like?

A: He just slumped back in the driver's seat and fell over into me.

. . .

Q: Now, after this happens, what do you see? What happens next?

A: I remember asking him, like, ["]why the F would you do that?["]

Q: Asking who?

A: [McRae], why would he shoot [Thach]. And he said, ["]don't worry about it, you next.["]

. . .

Q: What was he doing when he said that?

A: Loading his gun.

Q: Do you know what the gun looked like?

A: No, I just remember like an old western-type gun, like, a revolver or something.

. . .

Q: So[,] what are you—why aren't you out of the car right then and there after he shoots [Thach]?

- 4 -

A: I was shocked. I was trying to get out. I didn't grab my phone or anything. I was just trying to run to get us help.

Q: Did you try to alert [Thach] and see if he was okay?

A: I mean, I'm sure I probably did shake him before I jumped out of the car while asking him what's going on. But, you know, at that time, you're afraid of the situation like that, you just think of getting away. I remember getting out of the car and trying to run and hide underneath some of the parked cars, but I couldn't fit under the car, so that's when I got up and tried to run to get help at my sister's house.

. . .

Q: Okay. Now, at this point what happens?

A: I get out and start running, and once I couldn't fit under the car, it was just me running to get help, you know. So[, McRae] chased me down and put me in a headlock like this and I remember begging and pleading don't shoot me. He shot me anyway.

Q: [] So[,] you described him putting you into like a headlock and then you begged him not to shoot you?

A: Yes, I did.

Q: How do you know it was [McRae]?

A: Because he's the only one that was with us.

Q: And there was nobody else in the car when Thach got shot?

A: No, ma'am, just us three.

Q: And there was no one else around the area?

A: No, ma'am.

Q: Now, is there anything else that makes you certain that [] McRae shot you?

A: I looked him dead in his eyes when he shot [Thach] before I got out running and ran up the sidewalk. He was behind me. I could smell his scent, everything on him, I could just smell it, you know.

Q: So[,] when he's holding you in a choke hold, you can smell him?

A: Yes.

Q: Now, at that point in time, what do you remember?

A: Just remember falling to the ground like that was it.

Q: And at some point do you eventually get help?

A: Yes, somehow I managed to make it to my sister's door. I banged on the door, she opened the door and asked me what happened.

*Id.* at 486-88, 490-91. Hill testified that McRae shot her in the face and the back of her head. *Id.* at 493.

Pennsylvania Capitol Police Officer Michael Strohecker testified that he was on duty at the corner of Fourth and Walnut Streets in Harrisburg at approximately 1:30 a.m. on June 3, 2021 when he observed a vehicle turn the wrong way off of Fourth Street onto Walnut Street. *Id.*, 8/12/24, at 127-28. Officer Strohecker and his partner effectuated a traffic stop of the vehicle at the 500 block of Walnut Street. *Id.* at 132.

Officer Strohecker approached the passenger side of the vehicle and observed McRae in the driver's seat telling his partner that "his cousin was shot." *Id.* at 133. Officer Strohecker opened the passenger side door and saw "a larger gentleman later identified as William Thach in a reclined passenger seat" with "blood coming from his head and on his seat area." *Id.* at 134. Officer Strohecker testified that he removed Thach from the vehicle and started to treat him on the sidewalk; there was "a significant amount of blood coming from [Thach's] head . . . [which] made his long black hair pretty matted and . . . drenched like he had walked out of the shower." *Id.* Officer Strohecker indicated that McRae's demeanor was "very nonchalant like this

- 6 -

was just an everyday occurrence." *Id.* at 135. As Officer Strohecker performed a "blood sweep" of Thach, Thach told him that "he shot me." *Id.* at 137. Officer Strohecker asked if the driver—McRae—had shot him and Thach replied, "yes." *Id.*

Officer Strohecker then repeatedly ordered McRae out of the vehicle, but McRae did not comply. Officer Richards was finally able to secure McRae's left hand, after which Officer Strohecker placed him in handcuffs and the officers removed him from the vehicle. *Id.* at 138-39. After delivering Thach to the hospital, Officer Strohecker returned to the scene and, from outside the vehicle, observed a revolver in a plastic bag in the front passenger seat area. *Id.* at 143. Forensic investigator Karen Lyda subsequently recovered the revolver from the vehicle and identified it as a .38 Special. *Id.* at 154-55, 158. All of the weapon's rounds had been spent. *Id.* at 157.

William Henry Kimmick, III, a detective with the Dauphin County District Attorney's Office, was qualified by the Commonwealth as an expert in fingerprinting. Kimmick testified that he received two fingerprint cards for Lionel McRae, indicating the same date of birth as the defendant, from the South Carolina Law Enforcement Division and the Pennsylvania State Police. *See* Commonwealth's Exhibits 68 & 70. Kimmick testified that he compared the fingerprints from the two documents and was "100 percent certain . . . within a reasonable scientific degree of certainty that the fingerprints from the South Carolina card were made by the same person . . . who made the fingerprints on the Pennsylvania State Police card." *Id.*, 8/15/24, at 567.

Finally, the Commonwealth introduced into evidence certified documents from the Marlboro County, South Carolina Court of General Sessions showing that, on October 10, 2001, McCrae entered a guilty plea to one count of voluntary manslaughter in the shooting death of Vincent Byrd on October 19, 2000, and received a sentence of 20 years' incarceration. *See* Commonwealth's Exhibit 69.

The Commonwealth subsequently charged McRae with two counts of attempted murder[4] and one count each of firearm carried without a license,[5] possession of a firearm by a prohibited person,[6] and receiving stolen property.[7] Following a bifurcated jury trial, McRae was convicted of two counts of attempted murder and possession of a firearm by a prohibited person. On October 24, 2024, the trial court sentenced McRae to two consecutive sentences of 10 to 20 years' incarceration for attempted murder, plus a consecutive sentence of 6½ to 20 years' incarceration for persons not to possess, for an aggregate sentence of 26½ to 60 years. McRae filed a post-sentence motion for modification of sentence, which the trial court denied. On February 7, 2025, current counsel, Spencer H.C. Bradley, Esquire, entered his

_____

[4] 18 Pa.C.S.A. §§ 901, 2502.

[5] *Id.* at § 6106. At trial, after the Commonwealth rested, the defense moved for judgment of acquittal as to this charge, as the Commonwealth failed to present evidence that McRae lacked a license to carry a firearm. The Commonwealth conceded its error and the court dismissed the charge.

[6] *Id.* at § 6105.

[7] *Id.* at § 3925. This charge was withdrawn prior to trial.

appearance on McRae's behalf. McRae filed a timely notice of appeal and, on March 18, 2025, Attorney Bradley filed a Pa.R.A.P. 1925(c)(4) notice of intent to file an *Anders* brief and seek withdrawal as counsel.

Prior to addressing the merits of McRae's appeal, we must determine whether counsel has complied with the dictates of *Anders* and its progeny in his request to withdraw from representation. *See Commonwealth v. Goodwin*, 928 A.2d 287, 290 (Pa. Super. 2007) (this Court may not review merits of underlying issues without first examining counsel's request to withdraw). Court-appointed counsel seeking to withdraw from representation on the basis that the appeal is frivolous must:

> (1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; (2) file a brief referring to anything that arguably might support the appeal[;] and (3) furnish a copy of the brief to the defendant and advise the defendant of his [] right to retain new counsel or raise any additional points that he [] deems worthy of the court's attention.

*Id.*

Additionally, the Pennsylvania Supreme Court has explained that a proper *Anders* brief must:

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d 361. Finally, this Court must "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." **Commonwealth v. Flowers**, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Here, our review of counsel's **Anders** brief and application to withdraw reveals that counsel has complied with each of the technical requirements of **Anders** and **Santiago**. Counsel states that he has made a conscientious examination of the record, determined that further pursuit of a direct appeal would be frivolous, and furnished a copy of the letter sent to McRae advising him of his right to proceed *pro se* or raise issues in response to the brief.[8] **See Goodwin**, **supra**. Additionally, counsel's **Anders** brief complies with the requirements of **Santiago**. Accordingly, we conclude that counsel has substantially complied with the requirements for withdrawing from representation and proceed with an independent review of the merits. **See Flowers**, **supra**.

In his **Anders** brief, counsel first raises a challenge to the sufficiency of the evidence.

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court

---

[8] McRae has not filed a response to counsel's **Anders** brief.

is required to view the evidence in the light most favorable to the verdict winner[,] giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Stahl*, 175 A.3d 301, 303–04 (Pa. Super. 2017) (citation omitted).

Here, McRae was convicted of attempted murder and persons not to possess a firearm. In *Commonwealth v. Jackson*, 955 A.2d 441 (Pa. Super. 2008), a case addressing the sufficiency of the evidence to prove attempted murder, this Court stated:

> Under the Crimes Code, "[a] person commits an attempt when[,] with intent to commit a specific crime, he does any act which constitutes a substantial step towards the commission of the crime." 18 Pa.C.S.A. § 901(a). "A person may be convicted of attempted murder 'if he takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act.'" *Commonwealth v. Dale*, [] 836 A.2d 150, 152 (Pa. Super. 2003) (citation omitted). *See* 18 Pa.C.S.A. §§ 901, 2502. "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime." *Commonwealth v. Gilliam*, [] 417 A.2d 1203, 1205 ([Pa. Super.] 1980). "The mens rea required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence." *Commonwealth v. Schoff*, [] 911 A.2d 147, 160 (Pa. Super. 2006). "[T]he law permits the fact finder to infer that one intends the natural and probable consequences of his acts[.]" *Commonwealth v. Gease*, [] 696 A.2d 130, 133 ([Pa.] 1997).

*Jackson*, 955 A.2d at 444. Finally, "[t]he finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body." *Commonwealth v. Blakeney*, 946 A.2d 645, 651 (Pa. 2008) (citation omitted).

Here, the Commonwealth presented the testimony of Thach and Hill, which demonstrated that, without any provocation whatsoever, McRae pointed a loaded revolver at Thach while the three were seated in Thach's car and shot Thach in the head. McRae then told Hill that she was "next," chased her through the parking lot, placed her in a headlock, and shot her multiple times in the face and head. Officer Strohecker testified that Thach told him that McRae had shot him. A revolver with all of its rounds spent was subsequently recovered from Thach's vehicle, which McRae had been driving. This testimony was sufficient to enable a jury to conclude, beyond a reasonable doubt, that McRae intended to murder both Thach and Hill and that he took a "substantial step" towards the commission of that crime. *Jackson*, *supra*.

McRae was also convicted of persons not to possess a firearm. Pursuant to 18 Pa.C.S.A. § 6105(a), "[a] person who has been convicted of an offense enumerated in subsection (b), within or without the Commonwealth, . . . shall not possess, use, control, sell, transfer[,] or manufacture . . . a firearm in this Commonwealth." *Id.* at § 6105(a)(1).

Here, the testimony adduced at trial established that McRae possessed and used a firearm. Thus, the sole question is whether his prior South Carolina conviction for voluntary manslaughter[9] is "equivalent" to an offense enumerated in subsection 6105(b), i.e., voluntary manslaughter. *See* 18 Pa.C.S.A. § 2503. This issue raises a question of statutory interpretation.

---

[9] *See* S.C. Code Ann. § 16-3-50.

> When the question [is] one of statutory interpretation, our scope of review is plenary and the standard of review is de novo. Under the Statutory Construction Act of 1972, . . . our paramount interpretative task is to give effect to the intent of our General Assembly in enacting the particular legislation under review. We are mindful that the object of all statutory interpretation is to ascertain and effectuate the intention of the General Assembly . . . and the best indication of the legislature's intent is the plain language of the statute. When the words of a statute are clear and unambiguous, we may not go beyond the plain meaning of the language of the statute under the pretext of pursuing its spirit. However, only when the words of the statute are ambiguous should a reviewing court seek to ascertain the intent of the General Assembly through considerations of the various factors found in [s]ection 1921(c) of the [Statutory Construction Act, 1 Pa.C.S.[A.] § 1921(c)].

***Commonwealth v. Grove***, 170 A.3d 1127, 1141–42 (Pa. Super. 2017), quoting ***In re D.M.W.***, 102 A.3d 492, 494 (Pa. Super. 2014) (quotation marks and citations omitted).

> In ***Commonwealth v. Robertson***, [] 722 A.2d 1047 ([Pa.] 1999), our Supreme Court defined an "equivalent offense" as being one "which is substantially identical in nature and definition as the out-of-state or federal offense when compared to the Pennsylvania offense." ***Id.*** at 1049 (emphasis and citation omitted). The ***Robertson*** Court further elucidated that, in determining whether offenses are substantially identical, a court should compare the requisite elements of the crime, including the actus reus and the mens rea. ***Id.*** Additionally, not only must the elements of the crimes be compared, but we must also compare "the conduct to be prohibited and the underlying public policy of the two statutes." ***Id.***

***Commonwealth v. Cyran***, 203 A.3d 1012, 1015 (Pa. Super. 2019).

Under South Carolina law, voluntary manslaughter is defined as "the unlawful killing of another without malice." S.C. Code Ann. § 16-3-50. The South Carolina Court of Appeals has expanded upon this definition as follows:

> Voluntary manslaughter is the unlawful killing of a human being in the sudden heat of passion upon sufficient legal provocation. Both heat of passion and sufficient legal provocation must be present at the time of the killing. The provocation must be such as to render the mind of an ordinary person incapable of cool reflection and produce an uncontrollable impulse to do violence.

*State v. Smith*, 609 S.E.2d 528, 530 (S.C. Ct. App. 2005). Even if sufficient legal provocation has aroused a defendant's passion, "if at the time of the killing those passions had cooled or a sufficiently reasonable time had elapsed so that the passions of the ordinary reasonable person would have cooled, the killing would be murder and not manslaughter." *State v. Knoten*, 555 S.E.2d 391, 395 (S.C. 2001).

The Commonwealth of Pennsylvania defines voluntary manslaughter as follows:

> (a) General rule.—A person who kills an individual without lawful justification commits voluntary manslaughter if[,] at the time of the killing[,] he is acting under a sudden and intense passion resulting from serious provocation by:
>
>> (1) the individual killed; or
>>
>> (2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

18 Pa.C.S.A. § 2503(a).

Under South Carolina law,

> An overt, threatening act or a physical encounter may constitute sufficient legal provocation. *State v. Gardner*, [] 64 S.E.2d 130, 134 ([S.C.] 1951). Sufficient legal provocation must include more than "mere words" or a display of a willingness to fight without an overt, threatening act. *State v. Rogers*, [] 466 S.E.2d 360, 362-63 ([S.C.] 1996); *State v. Johnson*, [] 476 S.E.2d 681, 682

- 14 -

([S.C.] 1996). Neither the exercise of a legal right nor a victim's attempts to resist or defend himself from crime constitute sufficient legal provocation. **State v. Ivey**, [] 481 S.E.2d 125, 127 ([S.C.] 1997); **State v. Shuler**, [] 545 S.E.2d 805, 819 ([S.C.] 2001).

**State v. Hernandez**, 690 S.E.2d 582, 585 (S.C. Ct. App. 2010).

In Pennsylvania, "[s]erious provocation" is defined as "[c]onduct sufficient to excite an intense passion in a reasonable person." 18 Pa.C.S.A. § 2301. "[T]he test for determining whether there was adequate provocation is whether a reasonable man, confronted with a particular series of events, 'became impassioned to the extent that his mind was incapable of cool reflection.'" **Commonwealth v. Anderson**, 323 A.3d 744, 753 (Pa. 2024), quoting **Commonwealth v. Montalvo**, 986 A.2d 84, 100 (Pa. 2009) (citation omitted). This Court has found sufficient provocation where the victim "slammed the appellant against the wall of [a] bar and later fired three shots at the appellant." **Commonwealth v. Duffy**, 512 A.2d 1253, 1261 (Pa. Super. 1986). Conversely, neither words of provocation nor slight assault are sufficient to reduce murder to manslaughter. **Commonwealth v. Sheppard**, 648 A.2d 563, 566 (Pa. Super. 1994). Likewise, "evidence showing a history of minor disputes [or] allegations of past infidelity has been held not to be sufficiently provocative to reduce murder to manslaughter." **Commonwealth v. Miller**, 987 A.2d 638, 651 (Pa. 2009) (citing cases).

In light of the foregoing, we conclude that South Carolina's voluntary manslaughter statute is equivalent to Pennsylvania's where they are nearly identical in substance. Both require: (1) an unlawful killing; (2) in the heat

of passion; (3) resulting from provocation constituting more than mere words; and (4) that the provocation renders the actor's mind incapable of cool reflection. Thus, evidence of McRae's prior South Carolina voluntary manslaughter conviction was sufficient to establish that he had been convicted of an enumerated offense under subsection 6105(b) and, as such, was prohibited from possessing a firearm under subsection 6105(a). Accordingly, McRae's sufficiency challenges are frivolous.

Next, counsel's **Anders** brief raises a challenge to the weight of the evidence. Our standard of review for a claim that a verdict is against the weight of the evidence is well-established:

> The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice.
>
> **Commonwealth v. Small**, [] 741 A.2d 666, 672–73 ([Pa.] 1999) [(citations omitted)]. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim. **Commonwealth v. Tharp**, 830 A.2d 519, 528 (Pa. 2003) (citations omitted).

**Commonwealth v. Champney**, 832 A.2d 403, 408 (Pa. 2003).

In order to preserve a challenge to the weight of the evidence, the claim "shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time

- 16 -

before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607(A)(1)-(3). The failure to preserve a weight claim pursuant to Rule 607 will result in waiver even if the trial court addresses the claim in its opinion for this Court. *See Commonwealth v. Thompson*, 93 A.3d 478, 491 (Pa. Super. 2014).

Here, McRae did not preserve his weight claim as required by Rule 607. He failed to raise the claim either orally or in a written motion prior to sentencing and did not include a weight claim in his post-sentence motion. Accordingly, he has waived his challenge to the weight of the evidence.[10] *See id.*

Finally, counsel raises a claim regarding the discretionary aspects of McRae's sentence. To adequately preserve a discretionary sentencing claim, the defendant must present the issue in either a post-sentence motion or raise the claim during the sentencing proceedings. *Commonwealth v. Cartrette*, 83 A.3d 1030, 1042 (Pa. Super. 2013) (en banc). In the non-*Anders* context, the defendant must also "preserve the issue in a court-ordered [Rule] 1925(b) concise statement and a Pa.R.A.P. 2119(f) statement." *Id.* However, where counsel files an *Anders* brief, this Court has reviewed the matter even absent a separate Pa.R.A.P. 2119(f) statement. *Commonwealth v. Zeigler*, 112

---

[10] Even if not waived, we would find this claim meritless. The record contains ample evidence, including the testimony of the victims and ballistics evidence, that McRae was the individual who shot Thach and Hill with a .38 caliber revolver that he was not legally entitled to possess. The verdict does not "shock one's sense of justice." *Small*, *supra*. Accordingly, even if properly preserved, McRae would be entitled to no relief on his weight claim.

A.3d 656, 661 (Pa. Super. 2015). Hence, we do not consider counsel's failure to submit a Rule 2119(f) statement as precluding review of whether McRae's issue is frivolous.

In his post-sentence motion, McRae challenged the consecutive nature of his sentence, asserting that it "far exceeds [his] rehabilitative needs" and arguing that "a concurrent sentence would facilitate [his] rehabilitative needs as well as protect[] the community." Post-Sentence Motion, 11/4/24, at ¶¶ 6-7. This Court has previously found that a challenge to the imposition of consecutive sentences, combined with a claim that the trial court failed to consider the appellant's rehabilitative needs, presents a substantial question. *See Commonwealth v. Caldwell*, 117 A.3d 763, 770 (Pa. Super. 2015). Accordingly, we will review the merits of McRae's claim.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias[,] or ill will, or arrived at a manifestly unreasonable decision.

*Id.*

We begin by noting that deference is accorded to the trial court's pronouncement of sentence because the trial court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. *Commonwealth v. Ward*, 568 A.2d 1242, 1243 (Pa. 1990). "When imposing a sentence, the sentencing court

- 18 -

must consider the factors set out in 42 Pa.C.S.A. § 9721(b), that is, the protection of the public, gravity of offense in relation to impact on victim and community, and rehabilitative needs of the defendant[.]" ***Commonwealth v. Fullin***, 892 A.2d 843, 847 (Pa. Super. 2006) (citation omitted).

Here, the trial court was in possession of and reviewed a presentence investigation report ("PSI") prior to imposing sentence. Where the court is in possession of a PSI, we "presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." ***Commonwealth v. Devers***, 546 A.2d 12, 18 (Pa. 1988). Additionally, counsel presented argument on McRae's behalf, emphasizing his difficult upbringing. ***See*** N.T. Sentencing, at 5. The court also provided McRae the opportunity to allocute, which McRae used to deny his guilt and assert that he was being punished for trying to help Thach. ***Id.*** at 15-16. The court then explained its guideline sentence as follows:

> THE COURT: [] I had the opportunity to review the [PSI] and I did listen to your counsel and I was able to note the things that he noted in the [PSI] about your upbringing and your background.
>
> I was also able to note not only your history, your prior record, and the offense that you were sentenced for[.]
>
> I also noted that the [PSI] indicated in your assessment that you are of a high risk to reoffend. No matter how you look at it, sir, it is clear that you served a substantial period of time in jail for a homicide that was committed when you were 17 years of age and you weren't out very long before you shot two people in the head. And there is no doubt, you know, you would have to have been the most unlucky person in the world for all those things to line

- 19 -

up for everyone to set you up for shooting these two people in the back of the head.

So[,] you can protest your innocence as much as you want to protest your innocence, but there's no doubt a jury of 12 citizens determined that you committed these offenses. The evidence was abundantly clear, the DNA, the blood that matched the person that you said you ran away from, all the circumstantial pieces of evidence pointed to no one else but you. There are no other explanations than what it was—that it was you.

The only thing that troubles me the most about this case, I have no doubt that you did this, but the why is what troubled me. But when I looked at the [PSI] and I looked at some of the things that you said, there is a callousness, a remorselessness. There's that wickedness of disposition that people talk about when they talk about homicides and you possess that. And I think that in your mind you have convinced yourself that perhaps the person who did this couldn't be you, but it was in fact you because you possess those classic traits of someone who is call[o]used and wicked and can't control his actions. And you shot those two people with the intent to kill them, and but for the grace of God, they are still alive and so I have no doubts about that.

Somewhere along the line in your life somebody could have perhaps turned you the other way but you didn't listen or you didn't seek the support, you didn't seek the guidance and you put yourself in this position where you could be, once again, this very easily could have been a life sentence for you, two consecutive life sentences for you, but through their strength[,] courage[,] and [] willingness to fight through their pain, they were able to come and face the person who tried to kill them and that's a very rare circumstance.

*Id.* at 15-17.

Upon review, we can discern no abuse of discretion. McRae shot two people in the head at close range, unprovoked, only three years after his release from prison for another killing. McRae took no responsibility for his crimes and claimed that he, in fact, was the victim. Under these

circumstances, the court was within its discretion to conclude that consecutive sentences were warranted.

Judgment of sentence affirmed. Petition to withdraw granted.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 8/12/2025